**LABARGE PRODUCTS, INC., Appellant,**

v.

**Togo D. WEST, Jr., Secretary of the Army, Appellee.**

No. 93–1266.

United States Court of Appeals, Federal Circuit.

Jan. 26, 1995.

William H. Gammon, Moore & Van Allen, of Raleigh, NC, argued, for appellant. With him on the brief was Kelley Dixon Moye.

Carol L. Wallack, Attorney, Commercial Litigation Branch, Dept. of Justice, of Washington, DC, argued, for appellee. With her on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and Anthony H. Anikeeff, Asst. Director.

Before ARCHER, Chief Judge,* MICHEL and SCHALL, Circuit Judges.

MICHEL, Circuit Judge.

LaBarge Products, Inc. (LaBarge) appeals from a November 23, 1992 decision of the Armed Services Board of Contract Appeals (Board). In its decision, the Board denied LaBarge's appeal of the contracting officer's final decision rejecting LaBarge's claim for reformation of its contract with the United States Army to provide a quantity of pipe couplings. *LaBarge Prods., Inc.*, ASBCA No. 33593, 93–2 BCA ¶ 25,630 (Nov. 23, 1991) (*LaBarge II*). Previously, the Board had denied the government's motion to dismiss for the lack of jurisdiction. *LaBarge Prods., Inc.*, ASBCA No. 33593, 91–3 BCA ¶ 24,110 (June 14, 1991) (*LaBarge I*). We hold that the Board did have jurisdiction under the Contract Disputes Act of 1978 (CDA or Act), 41 U.S.C. §§ 601–13 (1988), to hear LaBarge's appeal. We affirm the Board's decision on the merits as untainted by legal error and as supported by substantial evidence.

## I. BACKGROUND

This case arises out of a procurement by the Army for aluminum pipe sections and couplings to connect the pipe sections. On July 9, 1984, the Army issued a Request for Proposals (RFP) for the pipe and couplings. Representatives of the Victaulic Company of

* Chief Judge Archer assumed the position of Chief Judge on March 18, 1994.

America (Victaulic) worked closely with Army representatives throughout the development of specifications for the RFP. Before the RFP had issued, Lieutenant Colonel Andrew Foster, the project manager for the contract, attempted on several occasions to direct the proposed contract to Victaulic on a sole source basis. Shortly before the RFP was issued a decision was made that the coupling procurement should be competitive.

To ensure that the pipe and couplings would be compatible, the Army originally intended to award one contract to cover both. However, in response to a complaint from a potential contractor who wanted only to bid on the pipe, George O'Brien, who was overseeing the procurement, amended the RFP to allow bidders the option to bid on either the pipe or the couplings alone. On August 16, 1984, bids were received on both the pipe and coupling portions of the procurement. Reynolds Aluminum Co. (Reynolds) was the low bidder on the pipe portion. On August 31, the Army awarded Reynolds a contract on that portion of the procurement. La-Barge was the low bidder on the coupling portion of the procurement. It bid $38.50 per coupling for the base quantity and for the first option year and $40.80 per coupling for the second option year. Victaulic was the second lowest bidder. The Army did not at that time award a contract for the coupling portion of the procurement, however. In late August or early September, Captain Paul Daily of the Army Materiel Command communicated to Victaulic that LaBarge had submitted the lowest bid.

On September 12, 1984, O'Brien met with three representatives from LaBarge to explain that he intended to request best and final offers. O'Brien had become concerned over the amendment to the RFP which allowed for separate coupling and pipe contracts because the government would be responsible for any problems of incompatibility between the couplings and pipes. He was also concerned that pipes and couplings purchased in one year from one manufacturer should be interchangeable with those from a different manufacturer or a different year. O'Brien intended to request best and final offers which would include confirmation that the contractor would accept option provisions for the government to purchase production tooling and level three production drawings. O'Brien believed that government access to the production tooling and level three drawings could reduce variations between procurements and incompatibility problems. Charles LaBarge, then president of the company, saw this explanation as a device to avoid awarding the contract to LaBarge. He responded that the company would not lose the contract and would rebid in the "low 30's."

On September 12, the Army requested best and final offers for the coupling contract, including confirmation of the government's option to purchase the production tooling and level three drawings. On September 13, 1984, before best and final offers were due, Michael Gorsky, Victaulic's Contract Administrator, received a phone call in which an unknown person stated, "your competition on the coupling bid ... [is] going to bid in the low 30's this time."

Two bids were received in response to the request for best and final offers: a bid from LaBarge and a bid from Reynolds and Victaulic as joint venturers. LaBarge's bid of $32.90 per coupling for the base year and each of the option years made it the low bidder over Reynolds/Victaulic, which bid $32.50 per coupling for the base year but a higher price for the option years. LaBarge was not aware of the disclosures to Victaulic regarding its bids before submitting its best and final offer.

When it became clear that LaBarge had submitted the low bid, Foster attempted to have the company declared technically deficient and unacceptable by requesting an additional evaluation of the company. This matter was not pursued, however, because O'Brien refused to allow such an evaluation.

The Army planned to announce LaBarge as the winner of the contract on November 15. Before the announcement could be made, however, Victaulic filed a pre-award bid protest with the General Accounting Office (GAO) alleging that the amendment to the RFP was unfair to Victaulic and that the government had violated its proprietary rights. In a letter to the GAO in support of

the protest, Victaulic revealed the disclosure of LaBarge's bid by Daily and the September 13 telephone call to Gorsky.

By letter dated December 20, LaBarge joined the protest, claiming that preferential treatment had been given to Victaulic by Army personnel. In its letter, LaBarge stated that it had offered "a proper and bonafide proposal ... on August 16, 1984" and that its offer of August 16 "should be accepted and [the] contract awarded properly...." LaBarge was referring to its original bid of $38.50 per coupling for the base quantity and for the first option year and $40.80 per coupling for the second option year.

On May 6, 1985, the GAO denied the Victaulic protest. Thereafter, on June 21, the Army awarded the coupling contract to LaBarge at its best and final offer price of $32.90 per coupling. Subsequently, LaBarge successfully completed contract performance.

Following contract completion, LaBarge submitted a claim to the contracting officer in which it sought to have the coupling contract reformed to the August 16, 1984 bid price. This would have resulted in a total contract price increase of about $800,000. LaBarge claimed that reformation of the contract to the higher price was necessary in order to compensate it for the improper acts of certain Army personnel involved in the procurement. LaBarge asserted that there had been a conspiracy to direct the contract to Victaulic even though LaBarge had submitted the low bid in response to the RFP. According to LaBarge, its August 16 bid had been disclosed to Victaulic and the best and final offer round was merely a "sham." LaBarge claimed that, but for improper conduct, it would have been awarded the coupling contract at its higher, initial bid. LaBarge's allegations were based upon information it received during the Victaulic protest and upon information contained in an Army investigative report dated May 15, 1985, a copy of which LaBarge received after the contract had been awarded.

On September 16, 1986, after the contracting officer had issued a final decision denying the claim, LaBarge appealed to the Board under the CDA. In the Board proceedings, the government moved for a dismissal on the ground that the Board lacked jurisdiction to entertain the appeal because it was in the nature of a bid protest rather than a claim arising from a contract under the Act. *LaBarge I*, 91–3 BCA at 120,683. The Board disagreed, however, and concluded that it had jurisdiction. It therefore denied the motion to dismiss. *Id.* at 120,685. Subsequently, following a hearing on the merits, the Board denied LaBarge's appeal. *LaBarge II*, 93–2 BCA at 127,565. LaBarge appealed this decision on the merits. On appeal, the government challenges the Board's jurisdiction over LaBarge's claim.

## II. STANDARD OF REVIEW

Jurisdiction is a pure question of law which we review *de novo*. *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1576 (Fed.Cir.1992). Our review of the Board's fact findings is limited to a determination of whether those findings are supported by substantial evidence. 41 U.S.C. § 609(b) (1988). We will affirm the Board's decision if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *United States v. General Elec. Corp.*, 727 F.2d 1567, 1572 (Fed.Cir.1984). In addition, this court has held that credibility determinations of the trier of fact are virtually unreviewable. *Tecom, Inc. v. United States*, 732 F.2d 935, 938 n. 4 (Fed.Cir. 1984).

## III. DISCUSSION

### A. Jurisdiction

In order for a board of contract appeals to have jurisdiction under the CDA, the contractor's appeal must be from a decision of a contracting officer which decides a claim "relating to" a CDA contract. 41 U.S.C. § 605(a) (1988) ("[a]ll claims by a contractor against the government *relating to a contract* shall be in writing and shall be submitted to the contracting officer for a decision") (emphasis added); 41 U.S.C. § 607(d) (Supp. V 1993) (an agency board of contract appeals "shall have jurisdiction to decide any appeal from a decision of a contracting officer ... *relative to a contract* made by its agency....") (emphasis added). Thus, the criti-

cal jurisdictional issue in this case is whether the claim submitted by LaBarge to the contracting officer was a claim "relating to" the coupling contract.[1]

The government contends here, as it did before the Board, that LaBarge's claim did not arise from a contract covered by the CDA. According to the government, LaBarge is not truly seeking reformation of its contract. Rather, the government argues, LaBarge seeks to have the award to it set aside and to be awarded a new contract based on its initial bid. The nature of this claim is for breach of the implied contract of fair dealing,[2] which was preliminary and ancillary to the coupling contract because it addresses how the government must deal with offerors in the process of selecting a contractor. The government maintains that the Board may not assert jurisdiction over the implied contract of fair dealing under the CDA because that contract is not one covered by the Act.

For support the government relies on *Coastal Corp. v. United States*, 713 F.2d 728 (Fed.Cir.1983), which held that the implied-in-fact contract to treat bids honestly and fairly is not a contract covered by the CDA. In that case, Coastal Corporation (Coastal), a prospective government contractor, appealed to the Department of Energy Board of Contract Appeals (EBCA) a final decision by the contracting officer denying Coastal's claim for bid preparation costs incurred in connection with a solicitation for proposals that was prematurely cancelled. Coastal's claim was grounded in the implied-in-fact contractual obligation on the part of the government to treat Coastal's bid honestly and fairly. *Id.* at 730. Coastal contended that by cancelling the solicitation for an allegedly improper reason, the government had breached that obligation and, therefore, was required to pay Coastal's bid preparation expenses to com-

pensate for the breach. *Id.* After the EBCA denied the claim on the merits, Coastal appealed to this court. On appeal, we held that the EBCA had lacked jurisdiction over Coastal's claim. In so doing, we stated that the implied-in-fact contract obligating the government to treat a bid honestly and fairly is not a contract for the procurement of goods or services under section 3(a) of the Act. *Id.* Thus, because the CDA does not cover an implied contract to treat bids honestly and fairly, the Act could not give the EBCA jurisdiction over Coastal's claim.

The government maintains that *Coastal Corp.* applies here, even though the appellant in that case never formed a contract with the government as did LaBarge, because the claims in both cases are identical: they allege the government breached its implied duty to treat bids honestly and fairly. We disagree. *Coastal Corp.* does not resolve the critical issue in this case. Coastal's claim could not "relate to" a CDA contract as that term is used in the Act because Coastal was not a party to any such contract. Coastal was merely a disappointed bidder and, therefore, its claim could relate *only* to the implied contract to treat bids fairly.

Acknowledging that Coastal was merely a disappointed bidder, the government attempts to minimize this distinction by characterizing LaBarge's claim as also relating *only* to the implied contract to treat bids fairly. According to the government, LaBarge's claim does not "relate to" the coupling contract because, at the time of the alleged wrongdoing by the government and the request for and receipt of best and final offers, the contract did not exist. We disagree and hold that LaBarge's claim does "relate to" the coupling contract, giving the Board CDA jurisdiction over the claim.

1. It is undisputed that the coupling contract—which was for the procurement of goods—was a CDA contract. The CDA applies to contracts for (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair or maintenance of real property; or (4) the disposal of personal property. 41 U.S.C. § 602(a) (1988).

2. Once a party submits a bid in response to a request for proposals, there exists an implied-in-fact contract between the government and that party under which the government is obligated to treat the party's bid honestly and fairly. *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed. Cir.1983); *Keco Indus. v. United States*, 192 Ct. Cl. 773, 778, 428 F.2d 1233, 1236 (1970).

### 1. LaBarge Seeks Reformation of a CDA Contract

■ The government assumes that LaBarge's claim asserts *only* a breach of the implied-in-fact contract to treat bids fairly. However, LaBarge also asserts a claim "relating to" the coupling contract, which indisputedly is a CDA contract. In accordance with *Coastal Corp.*, a prospective contractor's *pre-award* bid protest based *solely* on the implied-in-fact contract is not covered by the CDA. However, LaBarge, an actual government contractor, brings a post-award claim for reformation of an existing CDA contract. In addition, that claim has two express and independent bases: (1) the implied contract of fair dealing; and (2) violations, during the bidding process, of 48 C.F.R. (FAR) § 15.610(d) (1984) prohibiting auction techniques.[3]

One of our predecessor courts, the United States Court of Claims, has applied the equitable principle of contract reformation when a contract has been written in violation of a law or regulation enacted for the benefit of prospective contractors. *CRF–A Joint Venture, Etc. v. United States,* 624 F.2d 1054, 1061–62, 224 Ct. Cl. 312, 324–26 (1980) (treating contracting officer's illegal requirement that first article samples be converted to production quality radio transmitters as an exercise of contract's option provision entitling contractor to increased payments); *Applied Devices Corp. v. United States,* 591 F.2d 635, 640–41, 219 Ct.Cl. 109, 119–20 (1979) (holding contractor was entitled to reformation of contract's cancellation charge term because government had violated regulation in calculating charge). These cases are binding precedent. *South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982) (in banc). *See also Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988) (if government violated applicable regulations in setting economic index incorporated into con-

tract, "the government cannot, by law, benefit from it" and contract must be reformed).

In this case, the prohibition of auction techniques in FAR § 15.610(d) is plainly for the benefit of the contractor. The regulation insures that every bidder and potential contractor operates with equal knowledge of its competitors' positions. Because LaBarge alleges that the government engaged in auctioning techniques violating section 15.160(d) in the formation of its contract, LaBarge may seek reformation of that contract. Because LaBarge's reformation claim may independently rest on this theory, it does not solely concern the implied contract to treat bids honestly and fairly.

■ According to the government, LaBarge's allegations of government misconduct are the kind of allegations that are ordinarily made in pre-award bid protests, not after award of a contract. However, if government officials make a contract they are not authorized to make, in violation of a law enacted for the contractor's protection, the contractor is not bound by estoppel, acquiescence or failure to protest. *Chris Berg, Inc. v. United States,* 426 F.2d 314, 317, 192 Ct.Cl. 176, 183 (1970); *Rough Diamond Co. v. United States,* 351 F.2d 636, 639–43, 173 Ct.Cl. 15, 20–27 (1965), *cert. denied,* 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966). In cases in which a breach of law is inherent in the writing of the contract, reformation is available despite the contractor's initial adherence to the contract provision later shown to be illegal. *Chris Berg, Inc.,* 426 F.2d at 317–18, 192 Ct.Cl. at 183 (contractor was entitled to reformation of a price increase after being denied leave to correct a mistaken bid in violation of applicable regulations, even though contractor had performed the uncorrected contract). Like the contractor in *Chris Berg, Inc.,* LaBarge may seek reformation of its price term, even after per-

---

**3.** FAR § 15.610(d) (1984), in place during the relevant period, stated:

> The contracting officer and other Government personnel involved [in negotiations] shall not engage in—
>
> .   .   .   .   .
>
> (3) Auction techniques, such as—

> (i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;
>
> (ii) Advising an offeror of its price standing relative to another offeror . . .
>
> (iii) Otherwise furnishing information about other offerors' prices.

formance, if that term was allegedly diminished by unlawful government acts.

■ Moreover, LaBarge's claim "relates to" the coupling contract both as to operative facts and requested relief.[4] The operative facts as alleged affected the lawfulness of contract formation and the reformability of contract terms. LaBarge alleges that the coupling price in its contract is lower than it would have been if the government had acted lawfully during the solicitation process and had not violated the FAR's prohibition on disclosing bids to competitors. Because the admitted leaking of LaBarge's bid and allegedly illegal request for best and final offers arguably could have affected the price of the coupling contract, there can be no doubt that a claim based upon these actions "relates to" that contract. The causal connection establishes the requisite relationship. Second, LaBarge submitted its claim to the contracting officer after completing the coupling contract, seeking reformation and additional compensation under that contract, thus requesting relief which clearly "relates to" the contract. Therefore, LaBarge's claim "relates to" the coupling contract even though it also asserts a breach of the implied-in-fact contract to treat bids fairly and honestly.

Accordingly, LaBarge brings a claim for reformation based on the valid theory of violation of a government regulation. Moreover, by looking to the operative facts, the alleged, adverse consequences of improper government acts, and the relief requested, it becomes clear that LaBarge's claim "relates to" the coupling contract within the meaning of that phrase intended by Congress, as demonstrated below.

### 2. Legislative History Supports Board Jurisdiction

Our holding that a reformation claim based on illegal government actions occurring before award of a CDA contract can "relate to" that contract is supported by the legislative

history of the CDA, exhaustively reviewed by one of our predecessor courts in *Paragon Energy Corp. v. United States,* 645 F.2d 966, 227 Ct.Cl. 176 (1981). The legislative history supports a holding that agency boards have jurisdiction over all appeals from contracting officer decisions on reformation claims relating to a CDA contract. As the *Paragon* court stated, "agency boards of contract appeals have authority under the Contract Disputes Act to grant equitable reformation." *Id.* at 975, 227 Ct.Cl. at 191. Thus, the Court of Claims saw the agency boards' reformation power as plenary. The legislative history supports that view.

The initial House and Senate bills contained an "all disputes" clause providing that each executive agency was:

> authorized to settle, compromise, pay, or otherwise adjust any claim by or against, or dispute with, a contractor relating to a contract entered into by it or another agency on its behalf, including a claim or dispute initiated after award of a contract, based on breach of contract, mistake, a misrepresentation, *or other cause for contract modification or rescission.*

H.R. 11002, § 4; S. 3178, § 4(a) (emphasis added) (quoted in *Paragon Energy Corp.,* 645 F.2d at 973, 227 Ct.Cl. at 187). The House Report explained the intent of the "all disputes" clause.

> The provisions of section 4 implement the Procurement Commission's recommendation that executive agencies be empowered, with very limited exceptions, to pay any claim or otherwise *resolve any dispute growing out of or in connection with a Government contract.*

H.R.Rep. No. 95–1556, 95th Cong., 2d Sess. 17–18 (1978) (emphasis added) (quoted in *Paragon Energy Corp.,* 645 F.2d at 973, 227 Ct.Cl. at 187).

Although the "all disputes" clause was deleted from the proposed CDA, related lan-

---

4. For purposes of jurisdiction, a claim is typically defined by operative facts and relief requested. *See, e.g., Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545, 1551 (Fed.Cir.1994) (in banc) (for two claims to be the same under 28 U.S.C. § 1500, a bar to jurisdiction, they must arise from the same operative facts, and must seek the

same relief); *Johns–Mansville Corp. v. United States,* 855 F.2d 1556, 1562 (Fed.Cir.1988) (five judge panel) (claims are distinguished under 28 U.S.C. § 1500 by their operative facts and not by the legal theories on which they are based), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989).

guage was added to section 8(d) that is even broader: "In exercising this jurisdiction, the agency board is authorized to grant any relief that would be available to a litigant asserting a contract claim in the [United States Court of Federal Claims]." (Codified as amended 41 U.S.C. § 607(d) (Supp. V 1993). With this amendment, Congress enacted the CDA. As the Court of Claims explained in *Paragon*, the purpose of the amendment was not to eliminate types of contract disputes from the scope of a board's jurisdiction under the CDA, forcing contractors to go to the court. Rather, the amendment was only meant to clarify that the CDA did not authorize contracting officers or agency boards to settle or compromise claims independent of their legal or contractual merits. *Paragon*, 645 F.2d at 974–75, 227 Ct.Cl. at 188–90.

After its review of the CDA's legislative history, the Court of Claims broadly summarized the jurisdictional scope given to the agency boards of contract appeals under the CDA:

> Congress could not have expressed itself more clearly to the effect that *all contractor claims* based upon a valid contractual theory fall within the procuring agencies' jurisdiction under the Contract Disputes Act. This was essential to Congress' design that all contract disputes be resolved according to *the same set of procedures*, beginning with the decision of the contracting officer.

*Id.* at 975, 227 Ct.Cl at 190. As the Court of Claims explained, the CDA gave the agency boards jurisdiction over "all contractor claims based upon a valid contractual theory." *Id.* LaBarge brings a contractor claim based upon the valid contractual theory of reformation due to alleged illegal government conduct. *See Chris Berg, Inc.*, 426 F.2d at 317, 192 Ct.Cl. at 183. Moreover, the reformation claim cannot fall outside a class defined as "all contractor claims," for there is no dispute that LaBarge is a CDA contractor.

Finally, our holding is consistent with the congressional intent underlying passage of the CDA. The CDA was enacted, in part, to end "the fragmentation of mechanisms for the resolution of claims in connection with Government contracts." *Paragon Energy Corp.*, 645 F.2d at 972, 227 Ct.Cl. at 185. Complete relief was made available both at agency boards of contract appeals and in the Court of Federal Claims precisely to alleviate the "fragmentation" problem. The government's rationale, however, ignores this basic change wrought by the CDA, indeed undercuts it by limiting the reformation claims a contractor may bring before an agency board. Such a result is contrary to "Congress' design that all contract disputes be resolved according to the same set of procedures...." *Id.* at 975, 227 Ct.Cl. at 190.

■ The result urged by the government is also contrary to the statutory provision which authorizes an agency board "to grant any relief that would be available to a litigant asserting a contract claim in the United States Court of Federal Claims." 41 U.S.C. § 607(d). Section 607(d) and its legislative history make clear that a contractor, at its free election, may bring a CDA claim either in the Court of Federal Claims or before the Board, as LaBarge has done. S.Rep. No. 1118, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5236 ("The contractor may choose one of two available routes for appeal from an adverse contracting officer's decision. First, he may take his appeal to the appropriate board of contract appeals ... [or he may] proceed directly to the Court of Claims for resolution of any dispute.").

As shown by the legislative history, although the Board would not have jurisdiction over a pre-award claim based on the implied contract to treat bids honestly and fairly, which cannot "relate to" a CDA contract, LaBarge's reformation claim does "relate to" a CDA contract, giving the Board jurisdiction over the claim.

### B. The Merits

LaBarge argues that the government conducted an improper auction, in violation of FAR § 15.610(d) (1984), when it made the request for best and final offers after Daily had revealed to Victaulic that LaBarge had been the lowest bidder in the initial offer and after the September 13 phone call to Victaulic's contract administrator. Because the FAR provision clearly was violated here, the Board looked to *Logicon, Inc. v. United States*, 22 Cl.Ct. 776 (1991), for guidance in

determining under what circumstances a request for best and final offers is improper after a government official has revealed information about a potential contractor's bid to a competitor. The plaintiff in *Logicon*, like LaBarge, claimed relief on the theory that the government violated the regulations prohibiting auctions by reopening negotiations and requesting a best and final offer after its earlier bid had been revealed to its competitor. *Id.* at 781–82. We also look to the detailed analysis of *Logicon* for guidance as to when negotiations may continue after FAR section 15.610(d) has been violated.

As the court noted, several competing concerns come into play. First, is "the bastion of federal procurement policy that all offerors must possess equal knowledge of the same information in order to have a valid procurement." *Id.* at 788. All offerors cannot have equal knowledge if one knows the previous bid of another. Secondly, the government has a strong interest in ensuring that the procurement meets its needs. Thirdly, in a ·negotiated procurement,[5] the contracting officer is entrusted with a relatively high degree of discretion. *Burroughs Corp. v. United States*, 617 F.2d 590, 597–98, 223 Ct.Cl. 53, 65 (1980). The contracting officer's discretion extends to the application of procurement regulations, which includes reopening discussions and requesting a best and final offer.[6] *Logicon, Inc.*, 22 Cl.Ct. at 782; *DLM & A, Inc. v. United States*, 6 Cl.Ct. 329, 331 (1984); FAR § 15.600 (1984) (the FAR "prescribes policies and procedures for selection of a source or sources in competitive negotiated acquisitions"). A rule that prevents the government from requesting further offers after one potential contractor's bid has been revealed protects the first of these concerns but can impinge upon the second and third.

The *Logicon* court balanced these concerns:

[A] prohibited auction may occur if an agency reopens discussions and calls for further [best and final offers] after disclosure of an apparent successful offeror's price, but only if the prejudice to the disappointed offeror outweighs the broader goal of maintaining procurement integrity. This circumstance depends on whether the agency expresses substantial concerns regarding the sufficiency of the proposal.... 

The court concludes that an improper auction would occur if, absent a rational or reasonable basis for deeming that the offerors fell short of meeting the Navy's needs in this procurement ... [the Navy] were to act on its intention to reopen negotiations and accept new [best and final offers].

22 Cl.Ct. at 788.

■ Like the *Logicon* court, we hold that the government may request further bids after violation of the FAR prohibiting revelation of information concerning a potential contractor's bid only if the government has a rational or reasonable basis for doing so unrelated to the violation. In this case, if the government's request for best and final offers was tainted by the motivation to direct the procurement to Victaulic, the request would be a sham, without a rational or reasonable basis.

■ LaBarge argues that the request for best and final offers was a sham designed by Daily, Foster and O'Brien to give Victaulic another chance to make the lowest bid in an attempt to direct the procurement to Victaulic. The Board found that the request was not a sham because it presented a reasonable way to answer a legitimate concern. This finding is supported by substantial evidence. Having the pipes and couplings produced by different manufacturers in different years might obviously create problems of compatibility between the pipes and couplings. By giving the government the option to purchase

---

**5.** The regulation governing negotiated procurements, such as that at issue here, states:

> Compared to formal advertising, negotiation is a more flexible procedure that includes the receipt of proposals from offerors, permits bargaining, and usually affords offerors an opportunity to revise their offers before award of a contract.

FAR § 15.102 (1984).

**6.** In *Logicon* the contracting officer requested a second best and final offer, which should not be done unless it is clearly in the government's interest to do so. *Logicon, Inc.*, 22 Cl.Ct. at 784; FAR § 15.611(c) (1990). Because this case involves a first request for best and final offers, the contracting officer does not have even this limit on his discretion to open discussions and request a first best and final offer.

the production tools and technical drawings, the request for best and final offers provided the government a reasonable way to address the potential problems.

However, LaBarge asserts O'Brien was involved in improper conduct and that the Board's finding to the contrary is not supported by substantial evidence. LaBarge points to evidence demonstrating that Daily and Foster worked closely with O'Brien and that they were involved in originating the idea to include the production tool and drawing option in the request for best and final offers. The Board did find that Daily and Foster attempted to direct the contract to Victaulic. The Board also found that O'Brien, a "very credible witness," was not involved in any of these improper efforts. This finding is supported by evidence demonstrating that O'Brien was involved in decisions that directed the contract away from Victaulic and to LaBarge, such as the decision to make bidding competitive rather than award it to Victaulic as a sole source and the decision not to evaluate LaBarge as technically unacceptable. Moreover, the fact that O'Brien worked closely with Daily and Foster is not sufficient evidence to support a finding that O'Brien knew of their improper purpose, or that he did not have a legitimate reason for issuing the request for best and final offers. The Board accepted as credible O'Brien's testimony that he was unaware of any attempt to direct the contract to Victaulic. We now accept this credibility determination as virtually unreviewable. *Tecom, Inc.*, 732 F.2d at 938 n. 4.

Disclosure of one offeror's bid does not make later negotiations per se illegal. Even though the disclosures to Victaulic clearly violated the FAR, O'Brien's request for best and final offers was not improper given that he had a legitimate reason for making the request, did not know of the disclosures, and was not trying to influence the outcome of the negotiations. Moreover, because LaBarge did not know of the disclosures when it made its final offer, the price of the final offer was not influenced by the disclosures. In addition, LaBarge was awarded the contract at its final offer price. Thus, LaBarge was not harmed by the disclosures in any concrete way contemplated by the FAR and, therefore, is not entitled to relief.

We have considered LaBarge's other arguments and find them to be unpersuasive.

The government argues that LaBarge waived its right to challenge the request for best and final offers because it did not pursue a pre-award bid protest. Because we affirm the Board's conclusion that LaBarge cannot succeed on the merits of its claim, we need not address this issue.

## IV. CONCLUSION

LaBarge's claim for reformation of the coupling contract is supported by a valid legal theory based on illegal government conduct. We therefore hold that the Board correctly asserted CDA jurisdiction over the claim. Because the Board's finding that the request for best and final offers was not a sham designed to direct the procurement to Victaulic but had a proper independent basis is supported by substantial evidence, we

*AFFIRM.*