# United States Court of Appeals for the Federal Circuit

2007-5143

GHS HEALTH MAINTENANCE ORGANIZATION, INC.,
(doing business as BlueLincs HMO),

Plaintiff-Appellee,

and

TEXAS HEALTH CHOICE, L.C.,
and SCOTT & WHITE HEALTH PLAN,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

Daniel B. Abrahams, Brown Rudnick Berlack Israels LLP, of Washington, DC, for plaintiff-appellee, GHS Health Maintenance Organization, Inc.

Michael S. Nadel, McDermott Will & Emery LLP, of Washington, DC, for plaintiffs-appellees Texas Health Choice, L.C., et al, argued for all plaintiffs-appellees.

Jane W. Vanneman, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief were Jeffrey S. Bucholtz, Acting Assistant Attorney General, and Jeanne E. Davidson, Director. Of counsel on the brief was Susan Whitman, Senior Counsel, Office of the General Counsel, Office of Personnel Management, of Washington, DC.

Appealed from: United States Court of Federal Claims

Judge Marian Blank Horn

# United States Court of Appeals for the Federal Circuit

2007-5143

GHS HEALTH MAINTENANCE ORGANIZATION, INC.,
(doing business as BlueLincs HMO),

Plaintiff-Appellee,

and

TEXAS HEALTH CHOICE, L.C.,
and SCOTT & WHITE HEALTH PLAN,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in case nos. 01-CV-517, 05-CV-371, and 05-CV-963, Judge Marian Blank Horn.

_____

DECIDED:    August 13, 2008

_____

Before MICHEL, <u>Chief Judge</u>, LINN, <u>Circuit Judge</u>, and ZAGEL, <u>District Judge</u>.<sup>*</sup>

ZAGEL, <u>District Judge</u>.

The United States appeals from a final judgment of the United States Court of Federal Claims invalidating an Office of Personnel Management ("OPM") regulation. <u>GHS Health Maint. Org., Inc. v. United States</u>, 76 Fed. Cl. 339 (Fed. Cl. 2007). The

---

<sup>*</sup>    Honorable James B. Zagel, District Judge, United States District Court for the Northern District of Illinois, sitting by designation.

regulation in question, 48 C.F.R. § 1652.216-70(b)(6), addresses the manner in which OPM sets rates for community rated plans that provide health benefits to Federal employees and retirees. GHS Health Care Maintenance Organization, Inc., Texas Health Choice, L.C., and Scott & White Health Plan ("Appellees") are entities that formerly contracted with OPM to provide such services. The Court of Federal Claims invalidated the regulation, concluding that it is arbitrary and violative of the intent of 5 U.S.C. § 8902(i). Id. at 376. We affirm.

## I.    BACKGROUND

Appellees all formerly contracted with OPM to provide health benefits to Federal employees and retirees under the Federal Employees Health Benefits Program ("FEHBP"), 5 U.S.C. § 8903(4). Congress conferred contracting authority on OPM via 5 U.S.C. § 8902. With respect to how OPM should calculate its rates, Congress directed that such rates should "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i).

OPM devised a process whereby it negotiates annually with each contractor to determine the benefits and premiums for the subsequent contract year. In an ordinary year (that is, a year other than the final year of a contractor's relationship with OPM), the rate-setting procedure involves two steps. First, in May of the year preceding the contract year, contractors propose premium rates for the upcoming contract year. The proposal is supposed to represent the contractor's estimate of what it will charge similarly sized subscriber groups ("SSSGs"), i.e., the contractor's comparable non-Federal customers, during the following year.

The second step involves reconciliation. In April of the contract year, OPM and the carriers reconcile the current year's rates (which were established in step one by estimating what the contractor would charge SSSGs) with the actual rates the contractor is charging SSSGs. If, in the course of this reconciliation process, it is determined that the current year's rates are higher than the rates the contractor is actually charging SSSGs, then the contractor remits the difference to OPM. If, on the other hand, it is determined that the current year's rates are lower than the rates SSSGs are paying, then the Government pays the contractor the difference.

This two-step process takes place in years other than the final year of a contractor's relationship with OPM. In a year when the contract is not renewed ("Final Year"), things change. Neither party is paid the difference between the established rates and the rates SSSGs are actually paying.[1] One might ask, why is the Final Year different from all other years? The reason is OPM promulgated a rule ("Nonreconciliation Regulation") stating: "In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates." 48 C.F.R. § 1652.216-70(b)(6). It is the validity of this regulation that Appellees challenge here.

GHS Health Maintenance Organization, Inc., Texas Health Choice, L.C., and Scott & White Health Plan each separately sued the government claiming entitlement to reconciliation revenues for the Final Years of their respective contracts with OPM.

---

[1] Appellees note that the reconciliation process occurs even in the Final Year. Appellees Texas Health Choice, L.C. and Scott & White Health Plan's Br. at 25. It is merely the post-reconciliation exchange of money (one way or the other) that does not occur in the Final Year.

Each argued that 48 C.F.R. § 1652.216-70(b)(6) conflicts with 5 U.S.C § 8902(i). After some procedural twists and turns, the three cases were consolidated in the United States Court of Federal Claims. The Court of Federal Claims granted the carriers' motion for summary judgment and denied the Government's cross-motion for summary judgment. GHS, 76 Fed. Cl. at 376.

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II.    DISCUSSION

"We review the Court of Federal Claims' grant of summary judgment without deference." Doe v. United States, 372 F.3d 1347, 1351 (Fed. Cir. 2004) (quoting Agwiak v. United States, 347 F.3d 1375, 1377 (Fed. Cir. 2003)).

### A. The Regulation Is Invalid

The central question is whether or not the Nonreconciliation Regulation is valid. The Supreme Court instructs that "a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise . . . ." United States v. Mead Corp., 533 U.S. 218, 229 (2001). The seminal decision governing how federal courts should evaluate the propriety of an agency's regulation is Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).

The Chevron Court established a two-step framework for determining the validity of an agency regulation. See Chevron, 467 U.S. at 842-43; see also Sears v. Principi, 349 F.3d 1326, 1328 (Fed. Cir. 2003). In the first step, a court must ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842-43. If the statute is ambiguous, the court should proceed to step two and ask "whether the agency responsible for filling a gap in the statute has rendered an interpretation that 'is based on a permissible construction of the statute.'" <u>Koyo Seiko Co. v. United States</u>, 258 F.3d 1340, 1346 (Fed. Cir. 2001) (quoting <u>Chevron</u>, 467 U.S. at 843).

We conclude that Congress has not directly spoken to the precise question at issue here. Identifying "the precise question at issue" is a necessary prerequisite to determining whether or not Congress has directly spoken on it. In this case, the precise question is: is OPM required to engage in reconciliation as part of its current rate-setting process, even in the Final Year of its relationship with a given carrier? The statute—5 U.S.C. § 8902—is silent on this question. The law does not mention reconciliation at all, much less reconciliation in the Final Year. The only relevant direction Congress gave on this point was that "[r]ates charged under health benefits plans . . . shall reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i). Section 8902(i) is not ambiguous. Congress was clear when it said that rates should reasonably and equitably reflect the cost of the benefits provided. Yet the statute does not clearly and unequivocally answer the question at hand, i.e., whether OPM is required to perform reconciliation in the Final Year. Because that question cannot be resolved by referring to the statute alone, we must proceed to step two.

Is the Nonreconciliation Regulation "based on a permissible construction of the statute?" <u>Chevron</u>, 467 U.S. at 843. With respect to the setting of rates, the statute contains broad, aspirational goals, but no detailed requirements. Thus, Congress has

"explicitly left a gap for [OPM] to fill," intending that OPM "elucidate a specific provision of the statute by regulation." Id. at 843-44. The import of that is that "any ensuing regulation," including the Nonreconciliation Regulation, "is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." Mead, 533 U.S. at 227.

The regulation at issue here is invalid both because it is contrary to the statute and because it is arbitrary and capricious.

### 1. The Regulation Conflicts With The Statute

The Nonreconciliation Regulation conflicts with 5 U.S.C. § 8902(i). When a regulation directly contradicts a statute, the regulation must yield. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (1997) ("A regulation cannot stand if it is arbitrary, capricious, or manifestly contrary to the statute."); Mead, 533 U.S. at 227.

We first briefly reiterate the broader rate-setting framework that OPM has constructed. Congress' charge vis-à-vis rate-setting was to command that rates "shall reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i). We infer that OPM designed its rate-setting mechanism with Congress' command in mind. The process OPM devised includes the pre-contract year estimate of SSSG rates, and then (in all but the Final Year) the mid-contract year reconciliation.

The carriers are not challenging this overarching rate-setting structure. See Appellees Texas Health Choice, L.C. and Scott & White Health Plan's Br. at 18. We need not evaluate the propriety of that larger system here. The sole question before us is whether the Nonreconciliation Regulation is valid. That question cannot be answered

without viewing the regulation—an exception to the established rule—in the context of OPM's overall judgment about how best to set rates consistent with § 8902(i).

During oral argument, Counsel for the Government conceded—with commendable candor—that reconciled rates are a proxy for costs.[2]  Oral Arg., <u>available at</u> http://oralarguments.cafc.uscourts.gov/mp3/2007-5143.mp3.  In truth, this is an unremarkable admission.  If the Government were to contend otherwise, it would admit that the heart of its rate-setting methodology patently ignores the one and only rate-setting directive that Congress handed down:  that rates should reasonably and equitably reflect costs.

OPM's established rate-setting process for ordinary years was designed to produce rates that reasonably and equitably reflect carriers' costs.  OPM endeavors to arrive at such rates by ensuring that the rates carriers charge the government are on par with the rates they charge their non-Federal subscribers.  OPM concedes this point. Nancy H. Kichak, the Director of the Actuaries, Retirement and Insurance Service for OPM, submitted a declaration ("Kichak Declaration") in the proceedings below.  In it, she acknowledged that "[w]hen OPM negotiates rates with a community rated carrier, its objective is to receive a rate that is derived in a manner consistent with the rate the carrier charges its other, non-Federal groups of a similar size."  Joint Appendix, at 78, ¶ 8.

---

[2]  Counsel, at a later point in the argument, did try to walk-back this concession, but the toothpaste was already out of the tube.  In addition, in its brief, the Government states:  "The reconciliation process does not provide a better reflection of the actual costs, but, rather, ensures that the Government pays rates that are developed using a methodology that is commensurate with the private sector." Appellant's Br. at 37.  The Government's attempt to cloud this issue notwithstanding, it is clear that the strategy OPM devised to comply with Congress' directive was to use SSSG rates as a proxy for reasonable and equitable costs.

This is one rational way to go about implementing Congress' command. The system presupposes that a competitive marketplace for health care services exists. It further assumes that the competitiveness of the market yields rates that are high enough to permit carriers to recoup their costs plus earn a reasonable profit,[3] but not so high as to be unfair.[4] OPM itself confirms this point. In her declaration, Ms. Kichak stated:

> Community rated health maintenance organizations are at risk when they determine their rates. If they charge too much, they are at risk of losing enrollees in the competitive open season process. If they charge too little, they may not earn enough premiums to meet the covered heath services of the group.

Joint Appendix, at 78, ¶ 5.

In short, OPM has concluded that if it pays rates that are commensurate with what a non-Federal group would pay, then those rates will reasonably and equitably reflect the carriers' costs. Again, this presumes that the rates reflect costs plus some reasonable profit, but Congress' command does not, in our view, foreclose the

---

[3] But for the ability to earn a reasonable profit, one wonders why these private, for-profit enterprises would be willing to contract with OPM.

[4] Community rated plans have obvious incentives to set rates which, at worst, cover the costs of the benefits provided. There is, too, the incentive to charge rates which yield profit but are not so high that they discourage non-Federal employees from engaging their services: competitors may offer lower rates. Federal employees and officers (including judges) are offered individual choices from a long menu of carriers. See http://www.opm.gov/insure/health/index.asp (last visited July 1, 2008). Thus, community rated plans have a similar incentive to offer plans which attract enrollees. The record contains no data showing whether carriers, as a matter of practice, tend to offer federal employees a better deal than non-Federal subscribers. They would have reason to do so, since the reconciliation process allows them to recoup the money they lose by so doing. Reconciliation operates to ensure that federal employees pay approximately the same price paid by non-Federal employees. In addition, it operates to ensure that a carrier receives approximately the same income from its federal programs as it does from its non-Federal programs.

factoring-in of reasonable profit as well (if it did, it would be unreasonable to expect that any carriers would be willing to enter into contracts with OPM).

Having seen that OPM devised its two-step rate-setting process (estimation followed by reconciliation) in order to carry out the command of Congress, we now evaluate the Nonreconciliation Regulation. That regulation excises the reconciliation step in the Final Year. Viewed in the context of this regulatory structure, we conclude that the Nonreconciliation Regulation does contradict the statute. Regulations that contradict and undermine Congress' statutory schemes must be invalidated. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address, however, it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" (quoting ETSI Pipeline Project v. Missouri, 484 U.S. 495, 517 (1988)). The Nonreconciliation Regulation departs from OPM's established rate-setting procedure, and it does so in a way that is antithetical to the command of Congress. That is, the Nonreconciliation Regulation short-circuits the process OPM devised to achieve rates that reasonably and equitably reflect the costs of the benefits provided. The regulation ensures that rates in the Final Year are less reflective of the costs of the benefits provided than rates in the other years.

This follows from the notion that OPM's rate-setting process—estimation followed by reconciliation—is designed to yield rates that reasonably and equitably reflect costs. The key to achieving such rates is to ensure that the rates OPM pays are commensurate with the rates that non-Federal groups pay. Rates determined without

the reconciliation process are less likely to be on par with the rates SSSGs are paying. The further OPM's rates get from SSSGs' rates, the less reflective they are of costs.

We reject OPM's argument that the regulation is valid because the Final Year rate-setting process (estimation without reconciliation) would adequately implement the statute if it were the system in place for all years. The Government suggests that it would not be "unreasonable or inequitable" if the rate-setting procedure, in all years, consisted solely of the pre-contract year estimate and never contained the mid-year reconciliation. Appellant's Br. at 42. We disagree. A rate-setting system that relied only on the pre-year estimates (without a mid-year reconciliation) would conflict with the statute because in such a system, rates would be insufficiently reflective of costs. OPM made precisely that judgment when it formulated a system where rates were reconciled in all contract years, a system under which it presumably intended to set rates in a manner consistent with Congress' directive. Then, OPM promulgated the Nonreconciliation Regulation, which makes rates insufficiently reflective of costs in the Final Year. Because Congress' explicit command to OPM with respect to rate-setting was that rates should reflect costs—with no relaxation of that requirement in the Final Year—the Nonreconciliation Regulation conflicts with the statute and is thus invalid.

The Government seeks to avoid the result we reach here by offering an "alternative" rationale for the reconciliation process. During oral argument, counsel for the Government explained the reconciliation process this way: "The purpose of reconciliation is to make sure that when the carrier negotiates and sets a rate for January 1, that later in the year they don't give a better rate advantage or discount to [non-Federal groups] which would then end up subsidizing the whole thing." Oral Arg.,

available at http://oralarguments.cafc.uscourts.gov/mp3/2007-5143.mp3. At first blush, this may appear to undermine the idea that OPM seeks to comply with the statute by using rates charged to SSSGs as a proxy for costs. Concededly, if OPM's regulatory structure does not seek to ensure that rates reflect costs by using SSSG rates as a proxy for costs, then our analysis above would have to be reconsidered. Upon closer inspection, however, this "alternative" rationale does not undermine our analysis at all.

First, it is possible that the Government conjured this explanation for the reconciliation procedure as a post hoc rationalization to defend the regulation in this litigation. This explanation does not appear in the Federal Register where OPM justified the adoption of this regulation. The conclusion that this might not be a genuine explanation follows from the fact that sometimes the reconciliation process reveals that OPM was paying rates that were lower than the rates SSSGs were charged. When this happens, OPM pays the contractor the difference. In fact, the incidents that precipitated these lawsuits all involved carriers charging OPM rates that turned out to be lower than the rates they charged SSSGs. GHS, 76 Fed. Cl. at 344-46. If the reconciliation process was actually instituted to make sure that carriers did not subsidize their non-Federal subscriber groups on the back of OPM, one would expect the reconciliation process to mostly reveal that the rates OPM was paying were higher than the rates actually charged to SSSGs. The fact that carriers sometimes underestimate what they will charge SSSGs undermines the notion that the principal purpose of reconciliation is to thwart unscrupulous carriers. If the Government's "alternative" explanation is not its true justification, then we should disregard it for purposes here. See Bowen v. Georgetown University Hospital, 488 U.S. 204, 213 (1988) ("Deference to what appears

to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); Parker v. Office of Personnel Management, 974 F.2d 164, 166 (Fed. Cir. 1992) ("[P]ost hoc rationalizations will not create a statutory interpretation deserving of deference.").

Even assuming, arguendo, that the Government's "alternative" explanation is true—and there are reasons to accept that rationale as genuine[5]—this does not undercut our analysis here. The Government's explanation of the reconciliation process—that it prevents carriers from seeking to take advantage of OPM by boosting its pre-contract year estimate—is just another way of saying that the overall rate-setting process is designed to ensure comparability between the rates OPM pays and the rates non-Federal SSSGs pay. The Government insists that the purpose of the reconciliation process is to ensure that the actual rates OPM pays are on par with the rates SSSGs pay. This is patently true. In fact, our conclusion that the regulation contradicts the statute is premised on the notion that OPM's two-step process (estimation followed by reconciliation) was put in place to achieve this parity. It is further premised upon the notion that this parity is not simply a goal in and of itself, but a way of complying with the requirement that rates fairly and equitably reflect costs. The Government's explanation for the reconciliation process supports our ultimate conclusion. If reconciliation yields comparability, then abandoning reconciliation means that the rates OPM pays in the

---

[5]    The fact that the reconciliation process does not always reveal that OPM was paying rates in excess of what SSSGs are actually charged does not necessarily discredit the Government's explanation for the purpose of reconciliation. When the carriers make their pre-contract year estimates, they are aware that the reconciliation process will ultimately take place. Therefore, they have an incentive to make a good-faith estimate of the rates they will later charge SSSGs. Absent the reconciliation process, it is possible that some bad actors would artificially inflate the estimates in order to squeeze as much money as possible out of OPM.

Final Year will be less comparable to the rates SSSGs pay than in other years. If they are less comparable to the rates SSSGs pay—and the rates SSSGs pay are a proxy for reasonable and equitable costs—then Final Year (unreconciled) rates are less reflective of costs than rates in other years. Congress says that rates should reasonably and equitably reflect costs. Accordingly, the regulation—which abridges the process OPM devised to arrive at rates that reasonably and equitably reflect costs—must be struck down.

### 2. The Regulation Is Arbitrary And Capricious

Were we to conclude that the regulation did not directly conflict with the statute, we would nevertheless strike it down because it is arbitrary and capricious. As noted above, the Supreme Court in Mead delineated three grounds upon which a regulation in circumstances like these might be invalidated. Mead, 533 U.S. at 227. Those grounds are that the regulation is (1) procedurally defective; (2) arbitrary or capricious in substance; or (3) manifestly contrary to the statute. Id. No argument is made, and nothing in the record suggests, that there were any procedural infirmities surrounding the promulgation of this regulation. Separate and apart from our finding that the regulation conflicts with the statute, we also conclude that the Nonreconciliation Regulation is arbitrary and capricious. This is an independent basis for invalidating the regulation.

The Government faced a predicament in seeking to defend this regulation. The difficulty centers on the way in which the Government answers the following question: Was OPM endeavoring to implement Congress' rate-setting direction—embodied in § 8902(i)—when it promulgated the Nonreconciliation Regulation? This is a perilous

exercise because, ultimately, neither a "yes" nor a "no" provides much of a defense for the regulation. If the Government were to try to answer yes, it would then have to explain how abandoning reconciliation in the Final Year helps to achieve rates that reasonably and equitably reflect costs. For the reasons set forth above, we do not believe that Government can do so.

If the Government were to answer "no," and concede, in effect, that it ignored Congress' clear command when promulgating this regulation, then the regulation must likewise be invalidated. Judicial deference is premised upon the proposition that the agency will be construing and interpreting the statute when it promulgates regulations. See Mead, 533 U.S. at 226-27 ("[A]dministrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."); Rust v. Sullivan, 500 U.S. 173, 184 (1991) (holding that courts should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute . . . ."). Courts generally defer to administrative agencies when those agencies construe federal statutes. If an agency promulgates a regulation without regard for what Congress has said on the matter, however, the purpose for deference evaporates. In sum, irrespective of whether OPM promulgated the Nonreconciliation Regulation with § 8902 in mind or not, the result is the same: the regulation is invalid.

None of the Government's explanations in support of the Nonreconciliation Regulation adequately justifies it. An agency action is arbitrary and capricious if a court determines that the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983). It is not our place to compensate for any deficiencies that may exist with the agency's proffered explanations. We are only to evaluate the agency's stated rationales, not supply our own. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) ("We may not supply a reasoned basis for the agency's action that the agency itself has not given.").

The Nonreconciliation Regulation is arbitrary and capricious for two reasons. First, OPM has been unable to establish that the problem the Nonreconciliation Regulation was supposedly designed to address actually exists. And second, even if the problem did exist, the connection between that problem and the "solution" OPM devised is too attenuated to sustain the regulation.

a. OPM's Supposed Inability to Acquire Data Has Not Been Established

The Government asserts that OPM promulgated the Nonreconciliation Regulation because it was finding it difficult to acquire data in the Final Year of a carrier's contract. When the final version of the regulation was published, OPM justified it this way: "OPM's experience has been that it is difficult to get adequate data from plans when they have terminated. Further, in the event a plan goes out of business,

there are no rates to reconcile." 55 Fed. Reg. 27406, 27410 (July 2, 1990). There is a dearth of documentary support for the Government's assertion that OPM has had difficulty getting the data it needs in the Final Year. The Government points to two instances in the late 1980s when it sent letters to carriers regarding the carriers' insufficient documentation. It also points to the Kichak Declaration.

Quite simply, this does not constitute a sufficient basis to justify OPM's conclusion that it had a problem acquiring data in the Final Year. The agency points to few instances where it had a problem, and it makes no attempt to put these instances into perspective by, for instance, enumerating how many carriers had left the program in total.[6] Despite our repeated attempts during oral argument, Counsel for the Government was unable to further elucidate the alleged existence of the problem. Particularly when an agency seeks to defend a regulation that contravenes a Congressional directive, it must go far further than the Government has gone here in establishing that the supposed problem the regulation was meant to address actually exists.

In addition, the Government's reliance on the Kichak Declaration fails to help its cause. As the Court of Federal Claims aptly put it: "Ms. Kichak, in her declaration, was unable offer more than the two carriers named to try to demonstrate an allegedly pervasive problem of inadequate data for reconciliation in a carrier's Final Year of FEHBA participation." GHS, 76 Fed. Cl. at 363 n.5. The Kichak Declaration does

---

[6] This would have provided the denominator for a fraction representing the percentage of instances when OPM had difficulty acquiring the requisite data. The numerator of that fraction would, of course, have been 2.

nothing to enhance the Government's case that it was suffering from a problem of inadequate data in the Final Year.

Absent sufficient support in the record to justify OPM's contentions, we must set aside this supposed rationale. This is the only problem OPM pointed to when explaining the impetus for promulgating the Nonreconciliation Regulation. Vitiating it, therefore, leads us to conclude that the Nonreconciliation Regulation is arbitrary and capricious.

### b. The Proposed Solution Makes No Sense

Even if OPM had established that it experienced difficulty acquiring the requisite data in Final Years, we would nevertheless conclude that the Nonreconciliation Regulation is arbitrary and capricious. The Government has failed to explain the rational connection between the perceived data collection problem and the Nonreconciliation Regulation. The Government fails to persuade us that reconciliation should never take place in the Final Year, even where adequate records exist, simply because some firms, at some time, have had bad records.

The closest the Government comes to offering a justification for this solution is to say that it is necessary either to conserve its resources or to properly allocate risks. The resource utilization argument is wholly unpersuasive. As best we can decipher it, the Government seems to be arguing that the reconciliation process imposes a burden on OPM, and therefore, OPM may rationally choose to forego reconciliation in the Final Year in order to preserve its limited resources. The Government fails to explain, however, what differentiates the Final Year from all other years in this respect. That is, the Government does not tell us why it is that there are ample resources to conduct

reconciliation in every other year of a carrier's contract, but not in the Final Year. It is also a mystery how the Government connects this resource utilization argument with the alleged problem of inadequate data in the Final Year. There is a stark asymmetry between the problem that OPM said prompted the regulation in the first place—the difficulty in acquiring documents in the Final Year of a carrier's contract—and the justification it now proffers of needing to allocate resources effectively.

The second way in which the Government tries to connect the alleged problem with the Nonreconciliation Regulation is allocation of risk. When the agency published the final rule, it stated "the most reasonable solution [to OPM's difficulty in getting adequate data in the Final Year] is for both the Government and the carrier to bear the risk of a carrier's termination." 55 Fed. Reg. 27406, 27410 (July 2, 1990). The principal flaw in this argument is that Congress did not direct OPM to make sure that risk was allocated fairly. Rather, it directed OPM to ensure that rates fairly and equitably reflected costs. To take an extreme example, OPM could have promulgated a regulation requiring that in the Final Year, a blind-folded representative from the carrier will throw a dart against a dartboard adorned with various possible rates, and whatever rate it hits, that is the rate the carrier will receive. This rate-setting plan would allocate the risk between OPM and the carrier. Nevertheless, it totally ignores what Congress said about how to set rates. This is a far-fetched analogy, but it illustrates the potential mutual exclusivity between a rate-setting procedure that fairly allocates risks, and one that reasonably and equitably reflects the cost of benefits provided. Thus, even if the Government is correct that the rate-setting procedure in the Final Year fairly allocates risk between OPM and the carrier, this does not save the regulation.

In making the risk allocation argument, the Government again falls back on its refrain that "there would be nothing unreasonable or inequitable in a system in which OPM and the carrier **in all contract years** equally shared in the risk that the negotiated community rate either over-estimated or under-estimated the actual rates charged to SSSGs by the carriers." Appellant's Br. at 42 (emphasis in original). As we noted, this argument misses the point. OPM made a determination about how to carry out Congress' command and ensure that rates fairly and equitably reflect costs. The decision to deviate from the established rate-setting method in the Final Year must be assessed in the context of the overall system. Viewed in that framework, it is clear that OPM's method for calculating rates is far less responsive to Congress' instructions than the method used in all other years. This both conflicts with the statute and—because there is no valid basis for the deviation—is arbitrary and capricious.

OPM's arguments notwithstanding, the Nonreconciliation Regulation is an irrational response to the perceived problem of difficulty acquiring records in the Final Year. The reconciliation process occurs in April of the contract year. Thus, the carrier and OPM's relationship is ongoing at the time the reconciliation process takes place, even in a year when the contract will not be renewed. In fact, in the cases of each of the three Appellees here, the reconciliation process occurred in their respective Final Years. Appellants Br. at 42. Moreover, one of the Appellees, Texas Health Choice, L.P., actually received $622,246.00 from OPM before the agency determined that the carrier was not renewing its contract. 76 Fed. Cl. at 345-46. After making that determination, OPM demanded a refund of the $622,246.00. Id. at 346. This illustrates the absurdity of this entire situation. OPM is as capable of reconciling rates in a

carrier's Final Year as it is in all other years. In addition, the termination of a carrier's relationship with OPM should not be a barrier to adjustments for the Final Year.[7] The fact that OPM promulgated a regulation eschewing its normal process in the Final Year is arbitrary and capricious.

Abandoning reconciliation in Final Years actually undermines OPM's rate-setting framework. One of the effects of reconciliation is that it negates one of the incentives an unscrupulous carrier has to overestimate their rates. See supra, note 5. The process serves as a "check" to ensure that the rates OPM is paying actually correspond to the rates SSSGs are paying. The fact that reconciliation does not occur in the Final Year could create an opportunity for a carrier to, in bad faith, overcharge the Government. To be sure, the carriers here all underestimated the rates in their respective Final Years, despite the fact that they all knew that reconciliation would not take place. Nevertheless, removing this disincentive is arbitrary and capricious, particularly because it provides no corresponding benefit and because the Government has failed to adequately explain why it chose to deviate from its established procedure.

---

[7] The Government attempts to make much of the fact that OPM does not necessarily remit cash payments to carriers that underestimate their rates. See Appellant's Br. at 19-20. The Government argues that the Court of Federal Claims' ruling will upset the regulatory framework that is in place. Id. at 42-45. There are problems with this line of reasoning. First, as Texas Health Choice, L.P.'s experience reveals, OPM does—at least in some instances—remit a cash payment to a carrier as a result of the reconciliation process. Moreover, even if the Government never remitted funds in this way, OPM's argument ignores the fungible nature of money. It makes little or no difference whether reconciliation results in cash payments or in adjustments to future rates. Either way, as a practical matter, an adjustment has been made (either upward or downward) to the revenue a carrier receives for providing services in a given year.

The arbitrary nature of the Nonreconciliation Regulation is also evidenced by the fact that OPM has another regulation in place that deals with the perceived problem of inadequate record-keeping. That regulation states:

> the Carrier shall retain and make available all records applicable to a contract term that support the annual statement of operations and . . . the rate submission for the contract term for a period of 5 years after the end of the contract term to which records relate . . . .

48 C.F.R. § 1652.204-70. Unlike the Nonreconciliation Regulation, this provision is a reasonable reaction to the perceived problem of inadequate access to documents. In fact, this is a reasonable regulation for myriad purposes.[8] Particularly in light of this other regulation, OPM's choice—to abandon the reconciliation process in all Final Years, irrespective of whether the carrier at issue was able to produce the required documents—is arbitrary and capricious.

B. Reformation Was Proper

The Government also argues that even if the Nonreconciliation Regulation is invalid, reformation is an improper remedy here. We reject that argument.

Where a contract provision is based upon a regulation, and the regulation is deemed to be invalid, reformation is appropriate. See LaBarge Products, Inc. v. West, 46 F.3d 1547, 1552 (Fed. Cir. 1995) (holding that reformation was appropriate "when a contract has been written in violation of a law or regulation enacted for the benefit of prospective contractors"). In LaBarge, we also cited to our decision in Beta Systems,

---

[8]    The Government argues that this regulation does not apply in Final Years. Appellant's Br. at 37 ("Record retention regulations relating to annual operations do not apply to the reconciliation process in the Final Year of FEHBP participation."). The Government states it does not apply "because a carrier's operations in the final year do not include a reconciliation, by virtue of the challenged regulation." Appellant's Br. at 40. It is clear, though, that OPM does, in fact, reconcile in the Final Year, even if it does not make or receive the payments that would normally result from the process.

Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988). We explained the Beta Systems court as having held that if the government "violated applicable regulations in setting economic index incorporated into contract, 'the government cannot, by law, benefit from it' and contract must be reformed." LaBarge, 46 F.3d at 1552 (quoting Beta Sys., 838 F.2d at 1185).

We regard as frivolous the Government's attempt to sustain the regulation on the grounds that it was consented to by a contract that was signed by the carriers. The Nonreconciliation Regulation was non-negotiable. If anything is to be derived from the contract provision, it is an inference that OPM itself had profound doubts about the validity of the regulation.

III.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the Court of Federal Claims.

AFFIRMED