OPINION AND ORDER
BLOCK, Judge.
This tax ease presents two issues. The first is one of first impression[1] in this court: the extent to which collateral estoppel applies when the party to be precluded is alleged to have been “virtually represented” in the prior case by a different party alleging the same legal or factual interests. The doctrine of “virtual representation” is an .exception to the general rule in Anglo-American jurisprudence “that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.” Hansberry v. Lee, 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940); see Taylor v. Sturgell, — U.S. -, 128 S.Ct. 2161, 2171-72, 171 L.Ed.2d 155 (2008). The second issue is whether securities purchased on margin for a trust established on behalf of one of the nation’s esteemed universities constitute “debt-financed property” such that income derived therefrom is subject to the unrelated business income tax (“UBIT”) under §§ 511-14 of the Internal Revenue Code (“I.R.C.”), 26 U.S.C. §§ 511-14.
The facts that give rise to the two issues are uncontroverted and uncomplicated. Plaintiff, the Henry E. and Nancy Horton Bartels Trust for the Benefit of Cornell University (“Cornell Trust”), is a tax-exempt nonprofit organization pursuant to § 501(e)(3)[2] of the I.R.C., formed to provide support for Cornell University. Jt. Stip. of Facts # 2-3. During the 1999 and 2000 tax years, plaintiffs trustees invested some of the Cornell Trust’s funds in stocks “on margin,” i.e., using funds borrowed from plaintiffs broker to purchase the stocks. Jt. Stip. of Facts # 4. Following an audit of its 1999 tax return, plaintiff paid tax on the income derived from selling those margin-purchased securities for both the 1999 and 2000 tax years pursuant to the UBIT provisions of I.R.C. §§ 511-14. Jt. Stip. of Facts # 5-6 & Exs. 2-3. On September 24, 2002, plaintiff filed amended tax forms claiming a refund of $88,249 (the sum of its 1999 and 2000 UBIT tax payments). Jt. Stip. of Facts # 7 & Exs. 4-5. The Internal Revenue Service (“IRS”) denied plaintiffs refund claims on September 9, 2003. Jt. Stip. of Facts #8 & Ex. 6. Plaintiff filed the complaint in the instant action on October 31, 2003. See Compl. at 1.
In addition to the Cornell Trust, Henry and Nancy Bartels used a “substantially similar” instrument to create a trust for the benefit of the University of New Haven (“UNH Trust”). Jt. Stip. of Facts # 9. The UNH Trust and the Cornell Trust each have five trustees, three of whom are common to both. Id. During the 1991, 1992, and 1993 tax years, the UNH Trust also bought securities on margin, subsequently paid income tax (including interest and penalties) on the securities pursuant to the UBIT, and then sought a refund for those taxes, which the IRS denied in 1996. See Henry E. & Nancy Horton Bartels Trust for the Benefit of the Univ. of New Haven v. United States, 209 F.3d 147, 148 (2d Cir.2000) (“Bartels-UNH Trust”), cert. denied, 531 U.S. 978, 121 S.Ct. 426, 148 L.Ed.2d 435 (2000). Thereafter, the UNH Trust, relying on the same arguments as the instant plaintiff, unsuccessfully challenged the IRS’s denial of its refund. See id. at 148-49. Based on the similarities between the instant case and Bartels-UNH Trust, defendant has moved for leave to amend its answer to include the affirmative defense of collateral estoppel. See Def.’s Mot. for Leave to File First Am. Ans. (Jan. 19, 2006). As elaborated below, this court grants defendant’s motion, though it ultimately concludes that Bartels-UNH Trust has no preclusive effect.
*110 Also pending before this court are the parties’ cross-motions for summary judgment. Both motions hinge on whether the UBIT applies to the sale of securities purchased on margin by a trust established for the purpose of donating money to a university. As this opinion will explain, this court agrees with the Second Circuit in Bartels-UNH Trust and holds that plaintiffs margin investments are subject to the UBIT. Thus, plaintiffs motion for summary judgment is denied and defendant’s cross-motion is granted.
I. DISCUSSION
A. Standard of Review

1. Cross-Motions for Summary Judgment

The court will grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits supporting and opposing the motion, reveal that no genuine dispute exists as to issues of material fact and the movant is entitled to judgment as a matter of law. Rules of the Court of Federal Claims (“RCFC”) 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed.Cir.2001). The party moving for summary judgment bears the initial burden of demonstrating the absence of genuine issues of material fact. Celotex, 477 U.S. at 323, 106 S.Ct. 2548; Riley & Ephriam Const. Co., Inc. v. United States, 408 F.3d 1369, 1371 (Fed.Cir.2005). Because it is the movant who bears this burden, the court must view the facts and inferences therefrom in the manner most favorable to the non-movant. Brunner v. United States, 70 Fed.Cl. 623, 626 (2006). A fact is “material” if it has the potential to significantly affect the outcome of the case, and an issue is “genuine” if a reasonable fact-finder could, based on the record, decide it in the non-movant’s favor. Anderson, 477 U.S. at 248, 106 S.Ct. 2505.
Where, as here, the opposing parties have submitted cross-motions for summary judgment, the court need not decide in favor of one party or the other. Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed.Cir.1988); see Coca-Cola Co. v. United States, 87 Fed.Cl. 253, 256 (2009). Instead, “the court must evaluate each motion on its own merits,” Soo Line R.R. Co. v. United States, 44 Fed.Cl. 760, 762 (1999) (citing Thermocor, Inc. v. United States, 35 Fed.Cl. 480, 485 (1996)), just as when only one party moves for summary judgment. See Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed.Cir.2001); GHS Health Maint. Org. v. United States, 76 Fed.Cl. 339, 349 (2007), aff'd, 536 F.3d 1293 (Fed.Cir.2008); see also 10A Charles Alan WRIght, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2720 (2008). In other words, “rejecting one [cross-motion] does not mean that the other is justified.” Res. Invs., Inc. v. United States, 85 Fed.Cl. 447, 467 (2009) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.1968)); see Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed.Cir.1997).
The parties in the case at bar have stipulated to the material facts. See Jt. Stip. of Facts. However, plaintiff and defendant disagree as to the legal import of these facts. Therefore, this court must examine the law and decide whether one party is actually entitled to judgment as a matter of law.

2. Did Defendant Waive Its Collateral Estoppel Argument?

In its cross-motion for summary judgment, defendant argues that the Second Circuit’s disposition of Bartels-UNH Trust precludes the instant plaintiff, under a “virtual representation” theory, from litigating the issue of whether its margin investment income is unrelated debt-financed income for purposes of the UBIT. See Def.’s Cross-Mot..at 1, 6-12. In response, plaintiff asserts that defendant’s theory of collateral estoppel is inapposite to the facts at bar. Moreover, plaintiff contends that defendant’s failure to raise collateral estoppel at the pleading stage waived that affirmative defense. See PL’s Reply & Opp’n at 8-10 (citing RCFC 8(a)). Although *111 defendant cited case law holding that a party could raise a collateral estoppel defense after the pleading stage, it nevertheless moved to amend its answer to include the collateral estoppel defense. Def.’s Reply at 6; Def.’s Mot.- to Amend (Jan. 18, 2006). The initial issue then is whether defendant’s collateral estoppel argument is proeedurally defective.
The rules of this court state that “leave to amend shall be freely given where justice so requires,” RCFC 15(a)(2), yet this determination is solely within the discretion of the trial court. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); see also Van Vorst v. United States, 85 Fed.Cl. 227, 233 (2008). Nevertheless, the Supreme Court has instructed that without a sufficient reason, “such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment,” and the like, the trial court should grant the motion to amend. Foman, 371 U.S. at 182, 83 S.Ct. 227.
These Foman exceptions comprise the latitude of “freely given” amendments under RCFC 15(a)(2). See Mitsui Foods, Inc. v. United States, 867 F.2d 1401, 1403 (Fed.Cir.1989). Plaintiff does not allege— nor does the record suggest — that it would be unduly burdened by this amendment. Federal Circuit precedent, which binds this court, allows defendant to raise collateral estoppel at any time, even on appeal. See Caldera v. Northrop Worldwide Aircraft Serv., Inc., 192 F.3d 962, 970 (Fed.Cir.1999); Alfa Laval Separation, Inc. v. United States, 47 Fed.Cl. 305, 313 (2000). Therefore, this court must grant defendant’s motion to amend its answer. But while defendant has successfully raised this affirmative defense, it must still prove that its application is warranted in the ease at bar.
B. Does Bartels-UNH Trust Have Preclu-sive Effect on the Instant Non-Party Plaintiff?
This court has an independent duty to ensure that it has jurisdiction over the action at bar. Fisher v. United States, 402 F.3d 1167, 1173 (Fed.Cir.2005) (en banc in relevant part). It is well-established that the issue of collateral estoppel goes to subject matter jurisdiction because it deals with whether there is an actual “ease or controversy” before the court. See Schwasinger v. United States, 49 Fed.Appx. 888, 888 (2002) (summarily affirming a collateral estoppel-based dismissal for lack of subject matter jurisdiction against a serial litigant); Lowe v. United States, 79 Fed.Cl. 218, 227-28 (2007) (recognizing that collateral estoppel goes to this court’s subject matter jurisdiction). Thus, this court must address the issue of nonparty collateral estoppel before turning to the merits of the parties’ cross-motions for summary judgment. See Ashcroft v. Iqbal, - U.S. -, 129 S.Ct. 1937, 1945, 173 L.Ed.2d 868 (2009) (“Subject matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt.”).
Collateral estoppel, or issue preclusion, is “grounded on the theory that one litigant cannot unduly consume the time of the court at the expense of other litigants, and that, once the court has finally decided an issue, a litigant cannot demand that it be decided again.” Warthen v. United States, 157 Ct. Cl. 798, 798 (1962); see Restatement (Second) of Judgements § 27 (1982) (“When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.”). “To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation of attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.” Montana v. United States, 440 U.S. 147, 153-54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).
The Federal Circuit has developed a four-part test, under which the party invoking collateral estoppel (in this case, defendant) must show that:
(1) the issue is identical to one decided in the first action; (2) the issue was actually *112 litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action.
Innovad Inc. v. Microsoft Corp., 260 F.3d 1326, 1334 (Fed.Cir.2001); see Ammex, Inc. v. United States, 384 F.3d 1368, 1371 (Fed.Cir.2004) (same). The parties dispute only whether this final prong applies. See Def.’s Cross-Mot. at 7 (asserting that the first three collateral estoppel factors are “beyond dispute” and that only the fourth is truly at issue); Pl.’s Reply & Opp’n at 11-24 (only disputing defendant’s argument applying the “full and fair opportunity to litigate” prong); Def.’s Reply at 4 (“Plaintiff appears only to dispute this last element.”).
Defendant contends that plaintiff has already had “full and fair opportunity to litigate” the UBIT issue before this court because plaintiff was “virtually represented” through the UNH Trust in Bartels-UNH Trust, even though the two trusts are legally discrete entities. Def.’s Cross-Mot. at 7-9. Specifically, defendant highlights that although five trustees control each trust, the trusts share three trustees in common. Id. at 9. What is more, one of those shared trustees, Mr. Philip H. Bartels, is the attorney of record in the instant matter, just as he was in Bartels-UNH Trust. Id. Because the two trusts also used the same stockbroker and investment advisor, defendant asserts that “[i]t thus seems inescapable that plaintiff here was effectively in control of [Bar-tels-UNH Trust] through the attorney and three trustees it shares with [the UNH Trust].” Id. Based on what it characterizes as the “common control” of the two trusts, defendant maintains that plaintiff has already had its day in court and thus asks this court to deny it “a second bite at the apple.”[3] Id.; see also Def.’s Reply at 4-5 (asserting that this “common control” creates privity for collateral estoppel purposes).
However, defendant made its “virtual representation” argument supporting collateral estoppel before the Supreme Court curtailed the scope of the doctrine in Taylor v. Sturgell, — U.S.-, 128 S.Ct. 2161, 2167, 171 L.Ed.2d 155 (2008). Thus, this court must determine the extent to which defendant’s “virtual representation argument” remains viable, if at all.
In Taylor, the Supreme Court, for the first time, addressed whether the general rule barring preclusion against nonparties was subject to a “virtual representation” exception. Id. at 2167. Significantly, the Court explicitly rejected a broad application of the doctrine. Id. (“We disapprove the doctrine of preclusion by ‘virtual representation.’ ”).
The Supreme Court had granted Mr. Taylor’s petition for certiorari “to resolve the disagreement among the Circuits[4] over the permissibility and scope of preclusion based on ‘virtual representation.’ ” Id. at 2171. After discussing claim preclusion and issue preclusion in general, the Court explained that because a nonparty typically has not had a “full and fair opportunity” to litigate a suit, applying issue and claim preclusion against nonparties implicates due process concerns. See id. According to the Court, those concerns underlie “the general rule that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.” *113 Id. (internal quotations omitted). But despite this general rule, the Court identified six categories of exceptions that permit non-party preclusion in certain eases. Id. at 2172-73.
The first category is contractual, when a party agreed to be bound by the prior determination of issues in an action between others, as in a test case. See id. at 2172. The party need not have an express agreement to be bound; implied agreement and conduct inducing reliance are also sufficient to constitute an agreement for the purposes of this type of nonparty preclusion. See id. at 2172 & n. 7. This type of nonparty preclusion is well-established and is common in the federal courts. See Restatement (Second) of Judgments § 40 (1980).
The second category comprises “pre-exist-ing substantive legal relationships between the person to be bound and a party to the judgment-[such as] preceding and succeeding owners of property, bailee and bail- or, and assignee and assignor.” Id. at 2172. The Court explained that although these exceptions originated as much in property law as in the law of preclusion and were sometimes grouped together as relationships of “privity,” it declined to use the term “privity” because it had become an unhelpful, overly-broad, eonclusory label. See id. at 2172 & n. 8.
The third category consists of those “certain limited circumstances” in which the nonparty is precluded because it was “adequately represented by someone with the same interests who [was] a party to the same suit.” Id. at 2172 (alteration in original; internal quotation marks omitted). Shared motivation alone is insufficient to qualify for this “same interests” requirement; rather, the earlier party must have had some legal obligation to vindicate the rights of the non-party later precluded. See id. at 2172-73. Thus, the Taylor Court listed a proper class action representative, and a trustee, guardian, or other fiduciary, as examples of those earlier parties whose presence will subsequently preclude their nonparty beneficiaries. See id. at 2172-73.
The fourth category precludes a nonparty who had “assume[d] control over the litigation in which that judgment was rendered” because that party, through the opportunity to present proof and argument, has already had its day in court. See id. at 2173 (alteration in original; quoting Montana, 440 U.S. at 154, 99 S.Ct. 970). Such extensive control exceeds mere influence and instead requires the extensive involvement of the party-to-be-precluded in funding, arguing, and formulating the legal theory of the ease. See Taylor, 128 S.Ct. at 2173 (citing Montana, 440 U.S. at 154-55, 99 S.Ct. 970 (finding control-type nonparty preclusion appropriate where the nonparty: (1) caused the earlier lawsuit to be filed; (2) reviewed and approved the complaint; (3) paid the attorneys’ fees and costs; (4) directed the appeal to the Montana Supreme Court; (5) appeared and submitted a brief as amicus therein; (6) directed the filing of an appeal to the Supreme Court; and (7) on the advice of the Solicitor General, caused the captioned party to abandon that appeal) and Schnell v. Peter Eckrich & Sons, Inc., 365 U.S. 260, 261-62 & n. 4, 81 S.Ct. 557, 5 L.Ed.2d 546 (1961) (recognizing that this type of issue preclusion applied against a nonparty manufacturer that, pursuant to its contract of sale, defended and bore the expense of a patent infringement suit against the purchaser of its product)).
The fifth category prevents the proxy or designated representative of the party to earlier litigation from escaping its preclusive effect. Id. at 2173. This exception also covers situations in which the nonparty in the subsequent suit acts as the agent for a party bound by a judgment. Id.
The sixth and final category comprises “special statutory schemes ... otherwise consistent with due process” that explicitly foreclose successive litigation by nonparties. Id. at 2173. The Court listed bankruptcy and probate proceedings, quo warranto actions, and “other suits that, under the governing law, [may] be brought only on behalf of the public at large” as examples of this category of exceptions. Id. (internal quotations omitted; alteration in *114 Taylor).[5] For the purposes of clarity, this opinion will refer to the six categories of exceptions permitting nonparty preclusion as “contractual,” “property,” “fiduciary,” “control,” “agency,” and “statutory,” respectively.[6]
It is the application of the six-part Taylor test to the ease sub judice to which this court now turns. Clearly, the first and last of the six Taylor categories do not apply to this ease. The record does not indicate, and defendant does not allege, that the Cornell Trust agreed to be bound by the outcome of Bartels-UNH Trust. Nor does defendant identify a comprehensive statutory scheme like bankruptcy or probate that binds nonparties to the outcome of the first ease. Thus, defendant’s “virtual representation” theory fits neither the “contractual exception” nor the “statutory exception” permitting nonparty preclusion.
It is equally evident, despite the concluso-ry assertion that the Cornell Trust “is in privity” with the UNH Trust in Bartels-UNH Trust, Def.’s Cross-Mot. at 7-8, that defendant’s virtual representation theory does not fit within the “property exception.” Despite using this terminology, defendant does not identify any succession in or assignment of property interests between the two trusts. Here, defendant unwittingly illustrates why the Court eschewed the term “privity” in describing the “property exception,” even though the successions of interests giving rise to this exception would typically be described as relationships of privity. See Taylor, 128 S.Ct. at 2172 n. 8 (declining to use the term “privity” because it had become a conclusory label for situations in which nonparties were precluded and lost its clear property-based definition). Because defendant has not identified a succession of interest in property rights related to the issues at bar, defendant’s virtual representation argument does not fit the “property exception” set forth in Taylor.
Similarly, although the instant plaintiff is a trust, and shares three of its five trustees with the UNH Trust in Bartels-UNH Trust, defendant’s argument does not fit the “limited circumstances” in which the Taylor “fiduciary exception” applies. See Taylor, 128 5.Ct. at 2172. Here, neither trust is a fiduciary of the other; thus, applying the “fiduciary exception” to the facts at bar far exceeds the specific “limited circumstances” that the Taylor Court elaborated, such as a proper class action representation, permitting nonparty preclusion pursuant to this exception.
Moreover, this court must emphasize that it was the UNH Trust that was a party in Bartels-UNH Trust, not the common trustees. The UNH Trust and its trustees did not and do not act as a “representative for the beneficial interest” of the Cornell Trust and, therefore, the Taylor “fiduciary exception” does not apply. Sea-Land Servs., Inc. v. Gaudet, 414 U.S. 573, 593, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974); see Taylor, 128 S.Ct. at 2172-73 (citing Sea-Land to support the long-established fiduciary exception). This is not unlike the situation in Taylor itself. Despite the parties’ common interests in the outcome of that case, the Taylor Court refused to apply the “fiduciary exception” when *115 the record did not indicate that the prior party, Mr. Herrick, understood himself to be suing on behalf of Mr. Taylor. See 128 S.Ct. at 2178-79.
Therefore, plaintiff rightfully argues that there is no evidence that the UNH Trust’s litigation of Bartels-UNH Trust was not motivated “exclusively for the benefit of the University of New Haven,” let alone that the UNH Trust was obligated to vindicate the Cornell Trust’s legal rights. See Pl.’s Reply & Opp’n at 19-21 (emphasis in original; internal quotation marks omitted). Nor has defendant identified any legal interest that the UNH Trust was duty-bound to litigate on behalf of the Cornell Trust. Simply put, the Cornell Trust and the UNH Trust do not share any trust relationship. And, as defendant even concedes, neither trust controlled the other: “We do not believe — nor have we argued — that [the Cornell Trust] was under the control of or somehow overawed or coerced by [the UNH trust], or vice versa.” Def.’s Reply at 4.
Correspondingly, the three common trustees, despite collectively comprising a numerical majority in each trust, are neither themselves the alter-ego of each trust, nor do they make each trust the other’s alter-ego. The fact that the two trusts share common trustees is not, by itself, dispositive. Significantly, each common trustee, bound by fiduciary obligations to both trusts, could make justifiably different decisions for each trust. This is merely another way of stating that each trust is a discrete legal entity and that the two may have different interests. Instances of their shared desire in a particular outcome (as in the UBIT issue) is but a slender reed to support the weight of the virtual representation doctrine. The two trusts’ interests will not always be aligned, nor are the two entities virtually the same.
This leaves only the last two categories: the “control exception” and the “agency exception.” These exceptions, each of which serves to bind the real party of interest in a ease, can best be understood as two sides of the same coin. While the “control exception” binds a party to the determinations from prior litigation that it controlled as a nonparty, the “agency” exception precludes a party bound by a prior judgment from using a subsequent party as a puppet. In other words, the “control exception” looks back to whether the later party directed the prior litigation, whereas the “agency exception” looks forward to consider whether the prior party can direct the later party. Both exceptions thus focus on the relationship between the parties in the two cases.
Accordingly, both of these exceptions potentially apply to defendant’s “virtual representation” argument, which rests upon the relationship between the UNH Trust and the Cornell Trust by dint of their common tras-tees, attorney, and stockbroker. See Def.’s Cross-Mot. at 8-9 (“The question at bar, then, is whether the [UNH Trust] is so closely aligned with the interests of [the Cornell Trust] as to have been [its] virtual representative.... It thus seems inescapable that [the Cornell Trust] was effectively in control of [Bartels-UNH Trust] through the attorney and three trustees it shares with [the UNH Trust]. It is perhaps more precise to say that [the UNH Trust] and [the Cornell Trust] are commonly controlled.”); Def.’s Reply at 4 (“But can it seriously be contended that the trusts are not under common control?”). But here, defendant’s argument goes beyond the “limited circumstances” in which the “discrete exceptions” that permit nonparty preclusion apply. See Taylor, 128 S.Ct. at 2175.
First, Taylor cautioned against finding nonparty preclusion under the “agency exception” based on “a mere whiff of tactical maneuvering.” Id. at 2179. Instead, the Court indicated that lower courts should consider agency principles in considering whether this exception applies: “preclusion is only appropriate if the putative agent’s conduct of the suit is subject to the control of the •party who is bound by the prior adjudication.” Id. (emphasis added). Although defendant does allege common control, defendant has, at most, identified that the Cornell Trust is under the control of the three common trustees. But it is the UNH Trust that is bound by Bartels-UNH Trust, not the common trustees. Defendant’s “common control” argument does not establish that the Cornell Trust is the mere agent of the UNH Trust *116 because defendant has not proven that the UNH Trust, rather than the common trustees, has the right to control the Cornell Trust. See Taylor, 128 S.Ct. at 2179 (quoting Restatement (Seoond) of Agency § 14 (1957)).
The cases that Taylor cited for the “control exception” relied on the extensive involvement of the subsequently-precluded party, in funding and litigating the prior case to establish that control. See Taylor, 128 S.Ct. at 2173 (citing Montana, 440 U.S. at 154-55, 99 S.Ct. 970 and Schnell, 365 U.S. at 261-62 & n. 4, 81 S.Ct. 557). The Federal Circuit, whose precedent binds this court, has a similar requirement for this exception. See, e.g., Mother’s Rest. v. Mama’s Pizza, Inc., 723 F.2d 1566, 1569, 1573 (Fed.Cir.1983) (applying preclusion against a nonparty in an earlier case, which was the “real party in interest ... having financed and provided for the investigation and legal services of counsel for the preparation and trial” involving its “agent” (internal quotations and citations omitted)). The Cornell Trust did not fund Bartels-UNH Trust, nor does the record indicate that the Cornell Trust formulated litigation strategy for that case. Defendant identifies as the nexus between the two trusts their common interests[7] and trustees, one of whom is also the lawyer in both cases. But in Taylor, the Supreme Court flatly refused to apply the “control exception,” even though Mr. Taylor had the same interests as the prior litigant, with whom he had a “close relationship” and even shared the same lawyer. Consequently, defendant’s virtual representation theory, both on its own merits and by defendant’s admission, does not fall within the “limited circumstances” of control-type nonparty preclusion that Taylor elaborated.
Although Bartels-UNH Trust lacks pre-clusive effect, it did address arguments identical to those presently before this court concerning the UBIT’s applicability to the income from a university trust’s sale of its margin-financed securities. It is to this discussion that the court now turns.
C. The Unrelated Business Income Tax and Bartels-UNH Trust
As stated, both this case and Bartels-UNH Trust involve imposition of the UBIT to university trusts. To explain the UBIT this court first observes that all income, as a general rule, is taxable[8] unless exempted, and such exemptions to the income tax in the I.R.C. must be “specifically stated, and should be construed with restraint.” Jacobson, 336 U.S. at 49, 69 S.Ct. 358. One broad-based exemption relieves charitable organizations, such as the Cornell Trust and the UNH Trust, from federal income taxation. See I.R.C. § 501(c) (exempting from income taxation any “fund, or foundation, organized and operated exclusively for ... educational purposes, or to foster national or international amateur sports competition ..., no part of the net earnings of which inures to the benefit of any private shareholder or individual”). However, even this exemption has its own exceptions: despite its general tax-exempt status, a nonprofit organization must still pay income tax on certain commercial transactions unrelated *117 to the nonprofit’s tax-exempt purpose.[9] See I.R.C. §§ 511-14. Four interrelated sections of the I.R.C., operating in concert, effect the UBIT. Id.

1. The UBIT and Its Provisions

Section 511, the first of these sections, requires even otherwise-exempt organizations to pay tax on their “unrelated business taxable income,” which § 512 defines. I.R.C. § 511(a)(1), (b)(1). Among other organizations, § 511 applies the UBIT to the unrelated business income of all 501(e) tax-exempt organizations as well as charitable trusts. See § 511(a) (imposing the corporate tax rate on the unrelated business income of 501(e)-exempt organizations); § 511(b) (applying estate and trust tax rates to the unrelated business income of charitable trusts).
As the general rule, § 512 defines this “unrelated business taxable income” as “the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business,” subject to specific modifications elsewhere in the statute. See § 512(a)(1). Relevant to Bartels-UNH Trust and the instant ease, one such modification provides that “in the case of debt financed property (as defined in section 514) ... gross income from an unre-, lated trade or business,” is taxable.[10] § 512(b)(4) (emphasis added).
Section 513 provides a general (albeit somewhat circular) definition for an “unrelated trade or business”:
[I]n the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501
I.R.C. § 513(a). The Department of the Treasury (“Treasury”) has elaborated that “[tjrade or business is related to exempt purposes, in the relevant sense, only where the conduct of the business activities has a causal relationship to the achievement of exempt purposes (other than through the production of income).” 26 C.F.R (“Treas. Reg.”) § 1.513-l(d)(2).
Section 514, which elaborates on the phrasing of § 512, defines the term “debt-financed property” as “any property which is held to produce income and with respect to which there is an acquisition indebtedness (as defined in subsection (c))[11] at any time during the taxable year.” § 514(b). Importantly, this definition specifically excludes from its scope “any property substantially all the use of which is substantially related (aside from the need of the organization for income or funds) to the exercise or performance by such oi’ganization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501.” § 514(b)(l)(A)(i) (emphasis added). This section also excludes from “acquisition indebtedness” “indebtedness the incurrence of which is inherent in the performance or exercise of the purpose or function constituting the basis of the organization’s exemption.” § 514(e)(4) (emphasis added). In other words, income on debt-financed property is taxed under UBIT even if its use is substantially related to the purpose of the organization’s tax exemption, § 514(b)(l)(A)(i), but *118 not if incurring the debt is “inherent” to the organization’s exemption. See § 514(c)(4) (describing a § 501(e)(14) credit union that accepts deposits from its members as an example of acquisition indebtedness that is inherent to the exempt purpose of a § 501(e) entity).
In sum, according to the Treasury, an otherwise-exempt nonprofit’s income is taxable if: “(1) It is income from a trade or business; (2) such trade or business is regularly carried on by the organization; and (3) the conduct of such trade or business is not substantially related (other than through the production of funds) to the organization’s performance of its exempt function.” Treas. Reg. § 1.513-l(a). As in the present ease, the UBIT’s application to a § 501(c)(3)-ex-empt entity’s income from margin-purchased investments was the primary controversy in Bartels-UNH Trust, to which the court now turns.

2. Bartels-UNH Trust

In Bartels-UNH Trust, the UNH Trust challenged the IRS’s denial of its refund for the 1991-1993 tax years on the grounds that the income from the securities it purchased on margin were not properly subject to the UBIT. See 209 F.3d at 150. Specifically, the UNH Trust alleged that: (1) its securities investment activities, including margin trading, were not a “trade or business” under the I.R.C.; (2) neither the UNH Trust nor any third-party derived any “unfair competitive advantage” over non-exempt entities by earning income from trading on margin; (3) the margin-purchased securities are not “debt-financed property” under § 514(b)(1); and (4) its income from the margin-purchased securities is by definition excluded[12] from otherwise-taxable “debt-financed property” under § 514(b)(l)(A)(i) and “acquisition indebtedness” under § 514(c)(4).[13] Id. The Second Circuit did not accept any of the UNH Trust’s arguments.
The UNH Trust’s first argument, that its income from its margin-purchased securities is not a “trade or business” within the scope of Treas. Reg. § 1.513-l(a), was predicated upon Supreme Court precedent allegedly establishing a bright-line rule that securities investing cannot be a “trade or business” by definition. Bartels-UNH Trust at 150-51 (citing Higgins v. Comm‘r, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941) and Whipple v. Comm’r, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963)). However, the Second Circuit rejected this argument because those cases only construed “trade or business” generally, rather than in the context of the UBIT. Id. at 151. The Second Circuit instead pointed to the plain language of the UBIT, which specifically treats margin-purchased securities as “debt-financed property,” the income from which, by the UBIT’s definition, stems from an unrelated trade or business. Id.
The Second Circuit also rejected the UNH Trust’s next argument: that the UBIT did not apply to the trust’s income from margin-financed securities because it did not impose, whether directly or indirectly, an unfair competitive disadvantage upon any taxable entity. See id. at 151. The court simply found no “unfair competitive advantage” requirement in the plain text of the statute, which the court held to be dispositive. Id. Rather, the Second Circuit considered, and ultimately rejected, the UNH Trust’s argument that Congress only intended the UBIT to apply where the tax-exempt organization had such an advantage vis-a-vis a taxable entity. See id. at 151-52.
To be sure, the Second Circuit recognized that eliminating an unfair competitive advantage was one, and perhaps the primary, motivation for the UBIT. See id. at 152-53 (citing H.R. Rep. NO. 91-413); see also Portland Golf Club v. Comm’r, 497 U.S. 154, 161, 162 n. 12, 110 S.Ct. 2780, 111 L.Ed.2d 126 (1990) *119 (“Taxes are levied on ‘unrelated business income’ only in order to prevent tax-exempt organizations from gaining an unfair advantage over competing commercial enterprises.”) (citing S. Rep. NO. 81-2375 at 28 (1950)); H.R. Rep. NO. 91-413 at 44-46 (1969), reprinted in 1969 U.S.C.C.A.N. 1645, 1690-91 (explaining that the purpose of the 1969 amendment to the UBIT in § 514 was that “unfair business competition should be discouraged_ [B]y eliminating the incentive for owners desiring to sell a business to exploit the tax exemption of nonprofit organizations.”). The Second Circuit also explained that while the Supreme Court recognized this purpose, the Supreme Court never required the existence of unfair competition as a condition precedent to imposing the UBIT, especially for debt-financed property. See Bartels-UNH Trust at 152-53. The UNH Trust, the Circuit noted, also failed to cite a single court of appeals case requiring a showing of unfair competition before imposing the UBIT. See id. at 153 (citing cases from the First, Second, Seventh, Eighth, and Tenth Circuits). Although the UNH Trust urged the court to interpret the UBIT narrowly, “to tax only that category of conduct within the mischief Congress was attacking, namely, elimination of unfair competition,” the court refused to ignore the unambiguous statutory language. Id. at 153-54. Instead, the Bar-tels-UNH Trust court recognized, in the words of Judge Friendly, that “a legislature seeking to catch a particular abuse may find it necessary to cast a wider net,” and declined to require a showing that the statute did not. See id.
Furthermore, the Second Circuit also rejected the UNH Trust’s next argument, that its margin-purchased securities were not “debt-financed property” within the ambit of § 514 because it did not hold those securities to produce periodic income (i.e., dividends). See id. at 154. The Second Circuit pointed out that not only did the UNH Trust not cite any authority for its narrow interpretation of § 514(b)(1), but that the Treasury regulation elaborating on § 514 explicitly states that “income” from debt-financed property is not restricted to dividends and also includes “gains from the disposition of the property.” Id. (quoting Treas. Reg. § 1.514(b)-! (internal quotation marks omitted)). The Bartels-UNH Trust court concluded that the Treasury’s interpretation accorded with both the legislative history of § 514 and the I.R.C.’s broad general definition including both periodic (e.g., dividends) and non-periodic (e.g., proceeds from sale) income from securities as specific examples of “income” in § 61(a). See id. at 154-55. Thus, the UNH Trust’s interpretation of § 514 was unavailing to the court.
Finally, the Second Circuit rejected UNH Trust’s last argument, that § 514, by its specific definition, excluded the income from its margin-purchased securities from the scope of otherwise-taxable unrelated business income. Id. at 155. To buttress its conclusion, the UNH Trust contended that its margin-purchased securities were not “debt-financed property” pursuant to § 514(b)(1)(A)® because they were “substantially related” to the UNH Trust’s tax-exempt purpose. Id. The UNH Trust correspondingly argued that its purchase of securities on margin was excluded from the § 514(c)(4) definition of “acquisition indebtedness” because it was “inherent” to the UNH Trust’s exempt purpose. Id. But the Bartels-UNH Trust court rejected both related arguments, simply concluding that the UNH Trust did not need to purchase securities on margin to support the University of New Haven. See id. at 155-56. The court opined that the “substantially related” exclusion requires both that the property itself (rather than the income from it) be related to the organization’s exempt purpose, and that the mere need of the organization for income or funds is not a sufficient relationship. See id. Furthermore, it adopted the Third Circuit’s interpretation that “inherent” in § 514 means “essential.” See id. at 155 (citing Elliot Knitwear Profit Sharing Plan v. Comm’r, 614 F.2d 347, 349 (3d Cir.1980)) (defining “inherent” as “involved in the constitution or essential character of something_” (citing Webster’s New Collegiate Dictionary 593 (1976))). The court concluded that although purchasing securities on margin may be useful for the UNH Trust, it cannot be inherent (i.e., essential) when many alternative investments remained *120 available for the UNH Trust’s income-generating purposes. See id.
Having thus rejected each of the arguments before it as without merit, the Second Circuit upheld the UBIT’s imposition on the UNH Trust’s margin-purchased securities. Id. at 156.
D. Is the Imposition of the UBIT on the Cornell Trust’s Margin-Purchased Securities Income Justified?
The instant plaintiffs arguments echo those of the UNH Trust in Barbels-UNH Trust. Specifically, plaintiff argues that: (1) its margin-purchased securities were not “held to produce income” within the meaning of the I.R.C., PL’s Mot. for Summ. J. at 33-36; (2) the income from its margin-purchased securities qualifies for the “substantially related” exception in § 514(b)(l)(A)(i) and the “acquisition indebtedness” exception in § 514(c)(4), PL’s Mot. for Summ. J. at 66-77; (3) securities investing is not a “trade or business” by definition, PL’s Mot. for Summ. J. at 18-19; and (4) imposing the UBIT is improper because the Cornell Trust does not use its § 501(e) tax exemption to generate “unfair competition” with a taxable entity, PL’s Mot. for Summ. J. at 37-53. But, as was the ease for the Second Circuit in Bar-tels-UNH Trust, this court finds the Cornell Trust’s arguments unpersuasive.

1. Were Plaintiff’s Margin-Purchased Securities “Held to Produce Income”?

Plaintiff urges this court to construe the phrase “held to produce income” in § 514(b)(1) to apply only to “periodic” or a continuous stream of income from retaining those debt-financed properties — e.g., interest, rent payments, or dividends. PL’s Mot. for Summ. J. at 33-37. Plaintiff contends that the Treasury’s contrary interpretation encompassing the capital gains from selling such investments is at odds with the legislative history and the purpose of the UBIT and also would render that phrase mere surplus-age within the rest of the provision. Id. Thus, plaintiff asks this court to reject Treas. Reg. § l-514(b)-l(a), which interprets the UBIT to tax both periodic income and capital gains, as inconsistent with § 514(b)(1). Id.
This court finds persuasive the Second Circuit’s holding and rationale in Bar-tels-UNH Trust, where it rejected the UNH Trust’s argument that its margin-purchased securities were not “debt-financed property” within the ambit of § 514 simply because the trust did not hold those securities to produce dividends — i.e., periodic income. See 209 F.3d at 154. The Second Circuit was correct when it recognized that the Treasury regulation elaborating on § 514 clearly states that such debt-financed property “income” is not restricted to dividends, but also includes “gains from the disposition of the property.” Id. (quoting Treas. Reg. § 1.514(b)-l (internal quotation marks omitted)). So too was its conclusion that the Treasury’s interpretation was in harmony with both the legislative history of § 514 and the I.R.C.’s broad general definition including both periodic and non-periodic income from securities-i.e., dividends and proceeds from sale — as specific examples of “income” in § 61(a). See id. at 154-55.
This court may not rewrite the statutory text, as plaintiff essentially requests, by inserting the word “periodic” or “continuous” into the phrase “held to produce income,” in order to arrive at the result that plaintiff desires. This statute is clear on its face; there is no ambiguity for this court to interpret. Instead, I.R.C. § 61(a), which defines “gross income” as “all income from whatever source derived,” includes both periodic income (e.g., rents, royalties, dividends, annuities, pensions, interest) and nonperiodic income (e.g., compensation for services, gains from dealings in property, distributed shares of partnership gross income). Where the I.R.C. means to limit the scope of the term “income,” it specifically does so. See, e.g., I.R.C. §§ 101-39 (listing various types of income, none of which is capital gains), from the definition of “gross income” under the I.R.C. This court must again emphasize this aforementioned “Hoover vacuum” background principle of tax law: unless specifically excluded or exempted from taxation, all income is taxable by default.
*121 Even if, arguendo, this provision were ambiguous as to the scope of “held to produce income,” the legislative history, despite plaintiffs claims, does not express any doubt that this provision encompasses capital gains. As the Senate Report to the 1969 amendment to § 514 states:
Both the House bill and the committee amendments provide that all exempt organizations’ income from “debt-financed” property, which is unrelated to their exempt function, is to be subject to tax in the proportion in which the property is financed by the debt.... Capital gains on the sale of debt-financed property also are taxed in the same proportions.
S. Rep. NO. 91-552 at 63-64 (1969) (emphasis added), reprinted in 1969 U.S.C.C.A.N.2027, 2092. The treasury regulation that plaintiff would have this court reject adheres to both the statutory language and the legislative history, explaining that § 514(b) applies to:
any property which is held to produce income (e.g., rental real estate, tangible personal property, and corporate stock), and with respect to which there is an acquisition indebtedness (determined without regard to whether the property is debt-financed property) at any time during the taxable year. The term “income” is not limited to recurring income but applies as well to gains from the disposition of the property.
Treas. Reg. § 1.514(b)-l(a). Thus, because this provision is not “unreasonable and plainly inconsistent with the statute,” this court must sustain the regulation and its inclusion of both capital gains and periodic income as taxable under this provision and reject plaintiffs interpretation to the contrary. Fulman v. United States, 434 U.S. 528, 533, 98 S.Ct. 841, 55 L.Ed.2d 1 (1978); Bingler v. Johnson, 394 U.S. 741, 749-51, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969).

2. Is Debt-Financed Income “Substantially Related” or “Inherent” to Plaintiff’s Exempt Purpose?

Plaintiff next raises two parallel arguments why the income from the sale of its margin-financed securities, even if it would otherwise constitute unrelated business taxable income under §§ 511 and 512, falls into statutory exceptions in § 514. Pl.’s Mot. for Summ. J. at 66-77. Specifically, plaintiff maintains that its margin-purchased securities are excluded from the definition of “debt-financed property” in § 514(b)(l)(A)(i) because those securities are “substantially related” to its tax-exempt purpose. See id. Plaintiff also contends that the purchase of its securities on margin is excluded from the definition of “acquisition indebtedness” in § 514(e)(4) as inherent to plaintiffs tax-exempt purpose. See id.
This argument, too, the Second Circuit considered and rejected in Bartels-UNH Trust. 209 F.3d at 155. And this court finds its result and rationale persuasive. The court also notes that the Cornell Trust incorrectly conflates the purpose of producing income to support Cornell with the mechanism of using debt-financed or margin-purchased securities for that purpose. Cf. Ricci v. DeStefano, — U.S.-, 129 S.Ct. 2658, 2673-74, 174 L.Ed.2d 490 (2009) (rejecting arguments that “turn upon the City’s objective-avoiding disparate-impact liability-while ignoring the City’s conduct in the name of reaching that objective”).
The definitional exclusions themselves illustrate this point. The former, for “debt-financed property” in § 514(b)(l)(A)(i), exempts “any property substantially all the use of which is substantially related (aside from the need of the organization for income or funds) to the exercise or performance by such organization” of the function for which it received its § 501 exemption. The very text of this provision states that the “substantially related” exclusion does not apply where the debt-financed property is only related to the organization’s exemption insofar as it funds the organization. § 514(b)(l)(A)(i). Thus, while the use of debt-financed property may be substantially-related to the organization’s purpose, selling that property to fund the organization is still subject to the UBIT. Id.; see Bartels-UNH Trust, 209 F.3d at 155-56; see also Elliot Knitwear, 614 F.2d at 350 (concluding that the use of the property itself, and not the income that it generates, must be substantially related to the organiza *122 tion’s tax-exempt purpose to qualify for this exclusion).
Similarly, plaintiff also over-reads the exclusion in § 514(c)(4) to “acquisition indebtedness,” which exempts indebtedness that is “inherent in the performance or exercise of the purpose or function constituting the basis of the organization’s exemption.” This provision specifically identifies, by way of example, a § 501(c)(14) credit union accepting deposits from its members. § 514(e)(4). As both the Bartels-UNH Trust and Elliot Knitwear courts explained, the very purpose of a credit union is to loan money; it could not perform the function for which it received its tax exemption without incurring debt. See Bartels-UNH Trust, 209 F.3d at 155; Elliot Knitwear, 614 F.2d at 348-50. These courts interpreted “inherent” as “essential,” in that it was only by incurring debt that the exempt organization could fulfill its mission. See BartelsUNH Trust, 209 F.3d at 155; Elliot Knitwear, 614 F.2d at 348-50. This court agrees. Thus, while purchasing on margin may be desirable for plaintiff, and surely has some advantages over fully-funded purchases of securities, plaintiff has not established that it cannot support Cornell University by any other investment strategy.
In other words, nothing prevents plaintiff from using margin-purchased securities to provide income to support Cornell University; rather, it must merely pay income tax on those proceeds when it does so. According to plaintiff, its margin accounts are 1,136% larger than its cash accounts. Pl.’s Mot. for Summ. J. at 76. Margin investing has apparently been a successful strategy for the Cornell Trust, and it may even remain profitable after being subject to the UBIT. Yet plaintiff has not established that it must purchase securities on margin to support Cornell University, nor that its use of margin-purchased securities is substantially related to its support of Cornell University aside from the Cornell Trust’s need for funds to contribute. Thus, as was the ease in Bartels-UNH Trust, these definitional exclusions do not apply to proceeds from margin-purchased securities.

3. Is Securities Investment an “Unrelated Trade or Business”?

Plaintiff also asks this court to conclude that its securities investment activities in general, but especially the trading in margin-purchased securities that are the focus of this ease, are not “a trade or business” as the UBIT requires. See Pl.’s Mot. for Summ. J. at 14-30 (citing Treas. Reg. § 1.513-l(a)). Plaintiff contends that its activities do not meet the first prong of the test for “unrelated business taxable income,” which requires: (1) income from trade or business, (2) regularly carried on by the organization, (3) “the conduct of such trade or business is not substantially related (other than through the production of funds) to the organization’s performance of its exempt functions.” See United States v. Am. College of Physicians, 475 U.S. at 838-39, 106 S.Ct. 1591. In contending that the first prong of this test does not apply, plaintiff claims that the Supreme Court has established a “brightline rule” that securities trading is not a trade or business under § 162, the definition of which Treas. Reg. § 1.513-l(a) incorporates into the UBIT. Pl.’s Mot. for Summ. J. at 21-22 (citing, e.g., Burnet v. Clark, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397 (1932)). Thus, plaintiff concludes that because its investing is not a “trade or business,” the UBIT cannot apply to the income from its securities investing.
This argument, too, the Second Circuit addressed and rejected in Bartels-UNH Trust. See Bartels-UNH Trust, 209 F.3d at 150-55. Like the Bartels-UNH Trust court, this court finds it need not determine whether securities trading is a “trade or business” because a separate provision of the UBIT explicitly classifies income from debt-financed property as a trade or business by definition. Section 512 specifically includes within its definition of unrelated business taxable income “in the ease of debt-financed property” “gross income derived from an unrelated trade or business.” § 512(b)(4). Thus, it matters not whether plaintiffs activities are a “trade or business” under § 513, because § 512(b)(4) treats all income derived from debt-financed property as taxable and deriving from an unrelated trade or business. See Bartels-UNH Trust, 209 F.3d at 150-55.
*123 To be sure, when questioned at oral argument, plaintiff even conceded that § 512(b)(4) establishes a per se rule treating the proceeds from all debt-financed securities as income derived from an unrelated trade or business. Tr. at 25. Plaintiff also agreed that § 512(b)(4)’s inclusion of debt-financed securities displaced §§ 513 and 162’s definition of “trade or business,” Tr. at 25, and admitted that “[t]here is no question that the detailed language in 514 clearly encompasses the margin trading income at issue here with the Cornell Trust.” Tr. at 46. By so conceding, plaintiff admitted that its actions fall squarely within the text of the UBIT.
Thus, both by the terms of the UBIT and by plaintiffs admission at oral argument, the Cornell Trust’s income from its margin-purchased securities constitutes taxable income from an unrelated trade or business under § 512(b)(4)’s definition of debt-financed property. Thus,'plaintiffs argument to the contrary, just as in Bartels-UNH Trust, is unavailing and unpersuasive.

4. Do Tax Policy and Legislative History Support the Cornell Trust’s Position?

Despite plaintiffs admission that its margin investment profits fall within the language of § 514, plaintiff argues that its actions are exempt from tax because it did not obtain an unfair competitive advantage over any taxable entity. See Pl.’s Mot. for Summ. J. at 47. But as the Second Circuit observed in Bartels-UNH Trust, “there is nothing in the plain language of the UBIT requiring a showing of unfair competition.” BaHels-UNH Trust, 209 F.3d at 151. Nevertheless, plaintiff insists that the UBIT cannot apply without a showing of unfair competition. Pl.’s Mot. for Summ. J. at 55.
Indeed, the Cornell Trust raises the identical argument raised by the UNH Trust in Bartels-UNH Trust, asserting that this court should “look to the ‘mischief and defect’ that the statute was intended to cure” in interpreting the UBIT. Elliot Coal Mining Co. v. Office of Workers Compensation Programs, 17 F.3d 616, 631 (3d Cir.1994). Thus, plaintiff contends that this court may only apply the UBIT to the problem that Congress sought to redress-i.e., tax-exempt organizations using their tax exemption to unfairly compete with for-profit companies, whether directly or by acquiring for-profit companies.
With respect, despite the Third Circuit holding, this court rejects the notion that the “purpose” of a statute can override its express terms. As Justice Jackson opined, “we take the Act as Congress gave it to us, without attempting to conform it to any notions of what Congress would have done if the circumstances of this ease had been put before it.” Western Union Tel. Co. v. Lenroot, 323 U.S. 490, 501, 65 S.Ct. 335, 89 L.Ed. 414 (1945); see also Brogan v. United States, 522 U.S. 398, 408, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998) (Ginsburg, J., concurring) (“Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so_”). Here, as in Bartels-UNH Trust, plaintiff has not identified any statute nor binding precedent that requires a showing of unfair competition as a prerequisite to imposing the UBIT. This court cannot create such a requirement out of thin air. Nor did this court’s predecessor, when considering this same issue, require a showing of unfair competition from the tax-exempt entity before allowing the imposition of the UBIT. See Disabled Am. Veterans v. United States, 227 Ct.Cl. 474, 650 F.2d 1178, 1184 (1981); Am. Bar Endowment v. United States, 4 Cl.Ct. 404, 409 (1984).
Yet even if, arguendo, the UBIT were enacted primarily to address the potential unfair competitive advantage of tax-exempt non-profits, that does not exempt plaintiff from its broad scope encompassing income from debt-financed property. As the Second Circuit explained, “[e]ven though Congress enacted the UBIT primarily to eliminate unfair competition, it chose language going beyond the evil which it sought to correct in closing a loophole when it imposed the UBIT on ‘debt financed property.’” Bartels-UNH Trust, 209 F.3d at 153 (citing § 514). Moreover, ‘“[t]his standard is especially deferential in the context of classifications made by complex tax laws.’” NationsBank of Texas, N.A. v. United States, 269 F.3d 1332, 1338 (Fed.Cir.2001) *124 (quoting Nordlinger v. Hahn, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)); see Williamson v. Lee Optical, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (“The problem of legislative classification is a perennial one, admitting of no doctrinaire definition.”); see also Elliot Knitwear, 614 F.2d at 350 (purchase of securities on margin does not appear to create unfair competition but is nevertheless subject to the UBIT).
In sum, plaintiffs statutory and policy arguments are unavailing. Plaintiff, like the UNH Trust in Bartels-UNH Trust, has not established that the UBIT does not apply to the income that it generated from purchasing securities on margin.
II. CONCLUSION
Although this court permitted defendant to raise its collateral estoppel argument, that argument goes far beyond the limited, specific circumstances permitting nonparty preclusion that the Supreme Court set forth in Taylor v. Sturgell. Yet even though Bar-tels-UNH Trust does not bind this court, its rationale and conclusions are persuasive. Thus, this court finds that plaintiffs arguments are similarly belied by the plain text of the UBIT itself, and, ultimately, unsupported by plaintiffs citation to legislative history. Accordingly, plaintiffs motion for summary judgment is DENIED; defendant’s motion for summary judgment is GRANTED. The Clerk of the Court is directed to enter judgment in favor of defendant. Each side shall bear its own costs.
IT IS SO ORDERED.

. See note 6, infra.

. I.R.C. § 501(c) exempts "any ... fund, or foundation, organized and operated exclusively for ... educational purposes, or to foster national or international amateur sports competition ..., no part of the net earnings of which inures to the benefit of any private shareholder or individual ...” from the federal income tax.

. Defendant also warns this court about the specter of serial litigation, stating that it expects a future trust, with a similar relation to the Cornell Trust and the UNH Trust, to file suit in the D.C. Circuit. See Def.’s Cross-Mot. at 9 n. 4; Def.'s Reply at 5 n. 8.

. As the Court recognized, 128 S.Ct. at 2170 n. 3: The Ninth Circuit applies a five-factor test similar to the D.C. Circuit's. See Kourtis v. Cameron, 419 F.3d 989, 996 (9th Cir.2005). The Fifth, Sixth, and Eleventh Circuits, like the Fourth Circuit, have constrained the reach of virtual representation by requiring, inter alia, the existence of a legal relationship between the nonparty to be bound and the putative representative. See Pollard v. Cockrell, 578 F.2d 1002, 1008 (5th Cir.1978); Becherer v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., 193 F.3d 415, 424 (6th Cir.1999); EEOC v. Pemco Aeroplex, Inc., 383 F.3d 1280, 1289 (11th Cir.2004). The Seventh Circuit, in contrast, has rejected the doctrine of virtual representation altogether. See Perry v. Globe Auto Recycling, Inc., 227 F.3d 950, 953 (7th Cir.2000).

. Having elaborated the "limited circumstances” in which nonparty preclusion is appropriate, the Taylor Court rejected various lower courts' “virtual representation” theories to the extent that they did not fit the bounds of the six established categories. Id. The Supreme Court reasoned that such broad "virtual representation” theories "would recogniz[e], in effect, a common-law kind of class action,” violating "the general rule that a litigant is not bound by a judgment to which [it] was not a party.” Id. at 2175-76 (internal quotation omitted; alteration in original). Indeed, the Court warned that those broad "virtual representation” theories, which "authorize preclusion based on identity of interests and some kind of relationship between parties and nonparties” would circumvent due process by "allowing] courts to create de facto class actions at will.” Id. at 2176 (internal quotations omitted). Instead, the Taylor Court instructed the lower courts to adhere to its announced "crisp rules with sharp corners” rather than employing multi-factor tests that provide no firm guidance. See id. at 2176-77.

. Although the Federal Circuit has not yet addressed Taylor, the Court of Federal Claims did so at least in dicta in Kawa v. United States, 86 Fed.Cl. 575 (2009) (Miller, George, J.), where the court held that because there were no common issues between the prior and instant cases, the six Taylor exceptions permitting non-party preclusion were not applicable. See id. at 582-85.

. But even these interests are only common post hoc; the Cornell Trust had not even paid the UBIT when Bartels-UNH Trust was argued, on March 24, 1999. The tax years at issue in the instant case are the 1999 and 2000 tax years, and the Cornell Trust did not even request its refund, on the basis that the UBIT did not apply, until September of 2002. This court cannot presume that the common trustees understood themselves to be suing in Bartels-UNH Trust on behalf of the Cornell Trust when the instant plaintiff had not even paid the UBIT on the income from selling its securities at that time.

. See I.R.C. § 61(a) ("gross income means all income from whatever source derived,” subject only to exclusions specifically enumerated elsewhere in the Internal Revenue Code); United States v. Burke, 504 U.S. 229, 233, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) ("The definition of gross income under the Internal Revenue Code sweeps broadly”_) (citing § 61(a)). This expansive description, using "sweeping term[inolo-gy]” reflects Congress's "obvious purpose to tax income comprehensively,” Comm’r v. Jacobson, 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477 (1949), using " 'the full measure of its taxing power’ ... to bring within the definition of income 'any accessiofn] to wealth.' ” Burke, 504 U.S. at 233, 112 S.Ct. 1867 (quoting Helvering v. Clifford, 309 U.S. 331, 334, 60 S.Ct. 554, 84 L.Ed. 788 (1940) and Comm'r v. Glenshaw Glass Co., 348 U.S. 426, 431, 75 S.Ct. 473, 99 L.Ed. 483 (1955), respectively (alteration in Burke)).

. For example, the UBIT required a tax-exempt' medical organization to pay income taxes on funds generated by the sale of advertisements in its journal, because the sale of advertisements was not "substantially related" to the educational purpose of the journal and was thus taxable unrelated business income. See United States v. Am. College of Physicians, 475 U.S. 834, 848-50, 106 S.Ct. 1591, 89 L.Ed.2d 841 (1986).

. This provision also specifies that it applies notwithstanding other exemptions — set forth at § 512(b)(l)-(3), (5) — that exclude certain dividends, interest, payments, royalties, rents, gains from sale of property, and investment activities from the definition of unrelated business taxable income. See § 512(b)(4).

. The portion of this provision relevant to the case at bar defines the “acquisition indebtedness” as the amount of debt that the organization has incurred in acquiring the debt-financed property. See § 514(c)(1)(A).

. These provisions thus serve as exclusions from the debt-financed property exception to the charitable exemption from the general rule that all income is taxable. As Albert Einstein once said, "The hardest thing in the world to understand is the income tax.” See IRS — Tax Quotes, available at http://www.irs.gov/newsroom/article/ 0„id=110483,00.html (last updated Oct. 31, 2007; last viewed June 29, 2009).

. The Cornell Trust raises each of these same arguments in its Motion for Summary Judgment. Compare 209 F.3d at 150 with PL's Mot. for Summ. J.